No. 25-13913-E

IN THE

# United States Court of Appeals for the Eleventh Circuit

SHANNON SCHEMEL, ET AL.,
*Plaintiffs-Appellants,*

v.

CITY OF MARCO ISLAND, FLORIDA,
*Defendant-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF FLORIDA, FORT MYERS DIVISION
(NO. 2:22-CV-00079-KCD-DNF)

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Andreia Trifoi
    *Counsel of Record*
John J. Vecchione
Mark S. Chenoweth
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Dr., Suite 300
Arlington, VA, 22203
Phone: (202) 869-5210
Andreia.Trifoi@ncla.legal

*Counsel for Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is requested as it may aid this Court in deciding the complex and important issues in this case.  Among other issues, this case involves the extent of Fourth Amendment protections of Americans in the monitoring and storage of records of their movements.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ..............................ii

TABLE OF CITATIONS ..............................................................v

STATEMENT OF JURISDICTION ...............................................1

STATEMENT OF THE ISSUES...................................................1

STATEMENT OF THE CASE ......................................................2

   I.  Relevant Facts ............................................................3

   II.  Procedural History in the Court Below .........................8

STANDARD OF REVIEW ........................................................10

SUMMARY OF ARGUMENT.....................................................11

ARGUMENT ...........................................................................14

   I.  Appellants Have Stated a Claim that the ALPR Program Violates Their Fourth Amendment Right to Privacy..................14

     A. Appellants Have a Reasonable Expectation of Privacy in Their Physical Movements over Time................................16

     B. Marco Island's ALPR Scheme Violates Appellants' Reasonable Expectation of Privacy in Their Physical Movements over Time ...............................................................24

   II.  Appellants Have Sufficiently Alleged that the City's ALPR Scheme Effectuates a "Too Permeating Police Surveillance" that the Fourth Amendment Was Designed to Impede......................32

     A. Distinguishing *Carpenter* Based Only on the Means Used to Gather Information Fails to Account for Technological Advances, the Length of Time Gathered Information Is Kept, and the Limitations of the Fourth Amendment .......................33

     B. *Carpenter* and Post-*Carpenter* Cases Have Cautioned Against Dragnet-Type Surveillance Systems Like the City's ALPR Scheme...............................................................38

iii

III. Appellants Have Met Their Burden at the Motion to Dismiss Stage ...................................................................................... 44

   A. Appellants Should Have the Opportunity to Engage in Discovery as to the Fact-Intensive Issues in this Case ............ 45

   B. Prior ALPR Cases upon Which the City and the District Court Rely Have Been Decided on Motions to Suppress, Which Implicate a Different Standard of Review ............................... 49

CONCLUSION ............................................................................... 52

CERTIFICATE OF COMPLIANCE ..................................................... 54

CERTIFICATE OF SERVICE ............................................................. 55

iv

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................................ 11, 52

*Camara v. Mun. Court. of S.F.,*
  387 U.S. 523 (1967) ............................................................................... 15

*Commonwealth v. McCarthy,*
  142 N.E.3d 1090 (Mass. 2020) ........................................... 26, 27, 29, 45

*Fuqua v. Turner,*
  996 F.3d 1140 (11th Cir. 2021) ............................................................. 16

*Jackam v. Hosp. Corp. of Am. Mideast, Ltd.,*
  800 F.2d 1577 (11th Cir. 1986 ....................................................... 12, 52

*Katz v. United States,*
  389 U.S. 347 (1967) .................................................................. 13, 15, 18

*Kyllo v. United States,*
  533 U.S. 27 (2001) .................................................................... 15, 31, 42

*Leaders of a Beautiful Struggle v. Balt. Police Dep't,*
  2 F.4th 330 (4th Cir. 2021) .................................... 23, 24, 35, 38, 41, 49

*Mexican Gulf Fishing Co. v. United States Dep't of Com.,*
  60 F.4th 956 (5th Cir. 2023) .................................................................. 44

*Newbauer v. Carnival Corp.,*
  26 F.4th 931 (11th Cir. 2022) ............................................................... 10

*Quality Foods de Centro Am. v. Latin Am. Agribusiness Dev. Corp.,*
  711 F.2d 989 (11th Cir. 1983) ......................................................... 10, 51

*Schmidt v. City of Norfolk,*
  No. 2:24-CV-621, 2025 WL 410080 (E.D. Va. Feb 5, 2024) 24, 25, 60, 61

*Scholl v. Illinois State Police,*
  776 F. Supp. 3d 701 (N.D. Ill. 2025) .................................................... 60

*Smith v. United States,*
  873 F.3d 1348 (11th Cir. 2017) ........................................... 11, 52, 55, 58

*United States v. Baxter Int'l, Inc.*,
  345 F.3d 866 (11th Cir. 2003) ...................................................... 11, 52
*United States v. Brown,*
  No. 19-CR-949, 2021 WL 4963602 (N.D. Ill. Oct. 26, 2021) ................ 53
*United States v. Cooper,*
  No. 23-131, 2025 WL 35035 (E.D. La. Jan. 6, 2025) ........................... 59
*United States v. Cuevas-Sanchez,*
  821 F.2d 248 (5th Cir. 1987) ......................................................... 50
*United States v. Davis,*
  109 F.4th 1320 (11th Cir. 2024) ..................................................... 16
*United States v. Ellison,*
  462 F.3d 557 (6th Cir. 2006) ......................................................... 19
*United States v. Gregory,*
  128 F.4th 1228 (11th Cir. 2024) ..................................................... 49
*United States v. Jackson,*
  No. 24-CR-10010-JWB, 2025 WL 1530574 (D. Kan. May 29, 2025) ... 54
*United States v. Jiles,*
  No. 8:23-CR-98, 2024 WL 891956 (D. Neb. Feb. 29, 2024) ............ 46, 59
*United States v. Jones,*
  565 U.S. 400 (2012) ........................................ 19, 20, 21, 38, 39, 42, 50
*United States v. Karo,*
  468 U.S. 705 (1984) ..................................................................... 16
*United States v. Knotts,*
  460 U.S. 276 (1983) .............................................................. 39, 42, 44
*United States v. Lewis,*
  38 F.4th 527 (7th Cir. 2022) .......................................................... 38
*United States v. Mapson,*
  96 F.4th 1323 (2024) ................................................................ 55, 56
*United States v. Martin,*
  753 F. Supp. 3d 454 (E.D. Va. Oct. 11, 2024) ................................... 59
*United States v. Maynard,*
  615 F.3d 544 (D.C. Cir. 2010) ........................................................ 53

vi

*United States v. Rubin,*
   556 F.Supp. 3d (N.D. Cal. Aug. 25, 2021)...........................................29
*United States v. Sigouin,*
   494 F. Supp. 3d 1252 (S.D. Fla. 2019) ................................................60
*United States v. Smith,*
   110 F.4th 817 (5th Cir. 20234)................................................... 43, 51
*United States v. Sturdivant,*
   786 F. Supp. 3d 1098 (N.D. Ohio 2025) 31, 33, 34, 46, 49, 50, 53, 59, 62
*United States v. Toombs,*
   671 F. Supp. 3d 1329 (N.D. Ala. 2023) ................................... 46, 47, 59
*United States v. Tuggle,*
   4 F.4th 505 (7th Cir. 2021)..................................................................49
*United States v. Yang,*
   958 F.3d 851 (9th Cir. 2020) ....................................................... 45, 54

## Other Authorities

Jeremy Bentham,
   *Panopticon, or the Inspection House* (1791).......................................43
Order on Mots. to Dismiss,
   *Raul Mas Canosa v. City of Coral Gables, et al.,*
   No. 2018-033927-CA-01 (11th Cir. Ct., Oct. 15, 2019) ..................57, 58
Orin Kerr,
   "Implementing Carpenter," in *The Digital Fourth Amendment*
   (forthcoming) ................................................................................ 33, 41
Philip Hamburger, *Is Administrative Law Unlawful?* (2014)................51

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction under Article III, § 2 of the United States Constitution and 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction). The Complaint and Amended Complaint presented a case primarily arising under the Constitution and laws of the United States, as well as claims arising under the Florida Constitution.

This Court has jurisdiction under 28 U.S.C. § 1291 because this appeal seeks review of the district court's final order that dismissed the operative complaint in its entirety. The district court issued that final order on October 17, 2025, and Appellants filed their timely notice of appeal on November 5, 2025. *See* Doc 93.

## STATEMENT OF THE ISSUES

1.    Whether Appellants have sufficiently stated a claim under the Fourth Amendment by asserting that the City of Marco Island's warrantless and suspicionless collection and maintenance of ALPR records for at least three years violates Appellants' legitimate expectation of privacy in "the whole of their physical movements," as recognized in *Carpenter v. United States*, 585 U.S. 296, 310 (2018),

1

because the aggregation of such information can retroactively reveal detailed accounts of their movements over time?

2. Whether the district court erred in narrowing *Carpenter* to a bright-line rule against the warrantless access of cell-site location information or its technological equivalent instead of assessing the particular circumstances of this case and whether the City's use of ALPRs represents a permeating police surveillance which the Fourth Amendment was designed to impede?

3. Whether the district court erred in not allowing Appellants to proceed to discovery to resolve fact-intensive issues, including how much data is collected by the City's ALPRs, how long it is kept, and who it is available to, which cannot appropriately be decided in connection with a motion to dismiss?

## STATEMENT OF THE CASE

This case presents the question of whether the Constitution imposes any barriers to a municipal government's broad effort to impose a panopticon to watch and record the movements and whereabouts of that city's inhabitants and visitors. More specifically, does the daily, automatic monitoring of Appellants every time they enter and leave Marco Island, and the storage and use of that information for at least 3

years, violate their right to be free of unreasonable searches and seizures without warrant under the Fourth Amendment to the Constitution?[1]

## I.    RELEVANT FACTS

The Complaint alleges that Shannon Schemel,[2] Michael Tschida, and Stephen Overman ("Appellants") are citizens who reside in the City of Marco Island, Florida ("the City"). Doc 50 – Pg 4. They challenge the City's continuous, warrantless surveillance of them through automatic license plate readers (ALPRs). Doc 50 – Pg 2-3. Specifically, they assert that the City's warrantless, long-term aggregation of their ALPR location data violates their reasonable expectations of privacy in the whole of their physical movements and thus constitutes an unreasonable search under the Fourth Amendment. Doc 50 – Pg 2-3.

ALPRs are high-speed cameras capable of recording images of the license plates of all motor vehicles within their field of vision. Doc 50 – Pg 5. They can be operated while mobile (*e.g.*, mounted on a police

---

[1] The Complaint alleges violations of both the federal and the Florida state constitution. The district court dismissed the state claims once it granted the motion to dismiss of the federal claims. Therefore, Appellants will focus on the federal claims.

[2] Plaintiff-Appellant Shannon Druen was formerly known as Shannon Schemel but has since changed her surname. For consistency, this Brief will refer to her as Shannon Schemel as reflected in the case caption.

vehicle) or at a fixed location. *Id.* A single ALPR can record thousands of license plate images per minute. *Id.*

ALPRs are generally operated by local police departments. Doc 50 – Pg 6. Even though most data generated by ALPRs has absolutely no connection with criminal activity, those departments frequently share all information about innocent motorists with other law enforcement agencies. *Id.* Such data sharing significantly increases the potential threat to privacy interests. *Id.*

The City of Marco Island began using ALPRs in 2015 when it deployed its mobile unit. Doc 50 – Pg 7. Within the first five years of its operation, the mobile unit alone captured images of almost one million license plates. *Id.* In 2020, the City's Chief of Police Tracy Frazzano proposed to the Marco Island City Council the purchase of three additional ALPRs, to be placed on the bridges connecting the Island to the mainland. *Id.* She stated that the number of images captured annually by these three cameras would far exceed the number captured by the mobile unit. *Id.* However, Frazzano presented the City Council with no evidence indicating that this surveillance system was necessary to combat threats to public safety. Indeed, Marco Island was ranked as

one of the safest cities in the State of Florida.  *Id.*  (citing *Safest Cities in Florida - 2021*, Alarms.org (Jan. 19, 2020), https://www.alarms.org/safest-cities-in-florida/).

In 2021, the City installed these new ALPRs, placing one on each of the two spans of the Jolley Bridge, and a third on San Marco Road (at its intersection with Stevens Landing Drive) on the approach to the Gober Bridge.  Doc 50 – Pg 8.  These three bridges are the only points of entry and exit from the Island by car.  Doc 50 – Pg 9.  With an ALPR on each of the bridges, the City can ensure that every vehicle entering and exiting the island is photographed.  Indeed, the press release announcing the installation of the ALPRs reveals that the City strategically placed them on each of the bridges to achieve 100% coverage, stating:

> Marco island is geographically the optimal location to place stationary ALPR devices due to our unique nature.  Unlike a city with countless streets entering its jurisdiction, all our vehicular traffic enters and leaves via three bridges (Jolley, Minozzi, and Gober).  Our bridges, as focal points, allow for a minimum of four cameras.

Doc 50 – Pg 9.

ALPRs are connected to systems that convert the images of license plates into computer-readable data; the systems record license-plate numbers as well as the date, time, and location of the observation.  Doc

50 – Pg 5.  The City can—and intends to—share all the information it collects through its ALPRs with other law-enforcement agencies, including the Federal Bureau of Investigation.  Doc 50 – Pg 14.  Moreover, the City stated that it intends to use ALPR data to "proactively reduce crime and traffic incidents before they occur."  Doc 50 – Pg 14-15.

Marco Island is small.  It has a population of about 18,000 people and a land area of roughly 12 square miles.  Doc 50 – Pg 5.  It lacks any commercial train or airline service, and thus virtually the only means of entering or exiting the island is to drive a vehicle across one of its three bridges.  *Id.*

The principal means of transportation for Appellants are their cars and trucks.  Doc 50 – Pg 4.  Appellants must exit and enter Marco Island by driving on one of its three bridges virtually every day in connection with their daily activities, *e.g.*, shopping, commuting to work, visiting friends, and attending meetings.  *Id.*  In the years since the City installed its ALPRs, Appellants have driven across the bridges on thousands of occasions.  Doc 50 – Pg 9.  This means that the City has already photographed them thousands of times and will continue to do so while it operates its ALPRs.  Doc 50 – Pg 10.

In 2014, the Florida legislature adopted a statute seeking to limit ALPR data retention in response to privacy concerns surrounding ALPRs. *See* Doc 50 – Pg 11 (citing Fla. Stat. § 316.0778(2)) (requiring state officials to "establish a retention schedule for records containing images and data generated through use of an [ALPR] system. The retention schedule must establish a maximum period that the records may be retained."). In response, Florida's Criminal and Juvenile Justice Information System Council issued "Guidelines for the Use of Automated License Plate Readers." Doc 50 – Pg 11. These Guidelines provide that "information that is gathered without specific suspicion may be retained for no longer than 3 anniversary years." *Id.* The Guidelines do not prescribe a minimum period for record retention and make no recommendations regarding how long data should be retained. *Id.*

The City has indicated that it intends to maintain ALPR records for at least three years. The City has thus already accumulated a large database that contains a detailed, multi-year record of Appellants' physical movements. Doc 50 – Pg 10. Based on the frequency and the times of day of Appellants' bridge crossings, the City can easily construct a comprehensive profile of their day-to-day lives. *Id.* For example, the

City can determine whether Appellants are on or off the island at any time, 24 hours per day, 365 days per year. *Id.* The times and frequency of bridge crossings can also reveal where and when Appellants go to work, houses of worship, social events, among other things. *Id.* The City has no plans to expunge any of the data they have collected through ALPRs regarding innocent and lawful conduct in the foreseeable future. *Id.*

## II.    PROCEDURAL HISTORY IN THE COURT BELOW

Plaintiffs-Appellants filed their complaint in the Middle District of Florida on February 7, 2022. *See* Doc 1. Appellants asserted that the City's collection of detailed information about Appellants and capture of their movements for an extended period of time through ALPRs violates the Fourth Amendment to the U.S. Constitution, as well as Article I, §§ 12 and 23 of the Florida Constitution. Doc 1 – Pg 16-22.

Appellants sought a declaration that the City is violating Plaintiffs-Appellants' rights under the U.S. Constitution and Florida Constitution, and an injunction prohibiting the City from retaining for more than a brief period information it gathers through ALPRs regarding Appellants' movements by car. Doc 1 – Pg 23. Appellants also sought injunctions requiring the City to delete the information it has thus far maintained as

to Appellants, requiring the City to direct other law enforcement agencies with whom it has shared such information to delete the information, and prohibiting the City from sharing information regarding Appellants with other law enforcement agencies unless those agencies agree to abide by the terms of the Court's judgment. *Id.*

The City filed its first Motion to Dismiss on March 21, 2022, arguing, among other things, that Appellants' Complaint was a "shotgun pleading" and failed to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). *See* Doc 25. The district court granted in part and denied in part the City's Motion to Dismiss and required Appellants to amend their Complaint. *See* Doc 44. Appellants filed their First Amended Complaint on March 7, 2023, seeking the same relief they sought in their original Complaint. *See* Doc 50 – Pg 24.

The City filed its second Motion to Dismiss Appellants' First Amended Complaint for failure to state a claim on April 4, 2023. Doc 54. The City continued collecting data on Appellants for more than two years. The district court issued its Order and Opinion granting the City's second Motion to Dismiss on October 17, 2025, agreeing with the City that Appellants' allegations did not present a cognizable privacy interest or a

9

search within the meaning of the Fourth Amendment.  Doc 90 – Pg 6-8.

The court declined to exercise supplemental jurisdiction over Appellants'

state constitutional claims.  Doc 90 – Pg 7.  This appeal followed.

## STANDARD OF REVIEW

The standard of review in this case is *de novo.  See Newbauer v.*

*Carnival Corp.*, 26 F.4th 931, 934 (11th Cir. 2022) (quoting *Chaparro v.*

*Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012)).  The Complaint

was dismissed as a matter of law on the federal claims, with the pendant

state law claims dismissed thereafter.  Doc – 90, Pg 7-8.  "The threshold

of sufficiency that a complaint must meet to survive a motion to dismiss

for failure to state a claim is exceedingly low."  *Quality Foods de Centro*

*Am. v. Latin Am. Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir.

1983).  In assessing the sufficiency of a claim on a motion to dismiss, a

court must "accept all well-pleaded allegations as true and draw all

reasonable inferences in the plaintiff's favor."  *Smith v. United States*,

873 F.3d 1348, 1351 (11th Cir. 2017).  Detailed facts are not required—a

complaint need only "give the defendant fair notice of what the plaintiff's

claim is and the grounds upon which it rests."  *United States v. Baxter*

*Int'l, Inc.*, 345 F.3d 866, 881 (11th Cir. 2003) (quoting *Conley v. Gibson*,

355 U.S. 41, 47 (1957)).

A court should deny a motion to dismiss if the complaint includes "sufficient factual matter" that, if "accepted as true," states a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). Under Rule 12(b)(6), the standard is whether a plaintiff's allegations are sufficient to allow the case to proceed to discovery in an attempt to prove his claims, not whether the plaintiff will ultimately prevail in those claims. *See Jackam v. Hosp. Corp. of Am. Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1986).

## SUMMARY OF ARGUMENT

Since 2021, the City has collected thousands of photographs of Appellants' vehicles without suspicion, probable cause, or a warrant. The City has stored these time-stamped photographs in aggregated, computer-searchable form for at least three years for unfettered use by the City's own law enforcement officers, and by other government agencies with whom it shares the data. Because this data retroactively reveals Appellants' physical movements over time, the City's collection and retention of this information violates Appellants' right to privacy under the Fourth Amendment to the U.S. Constitution.

11

Appellants have asserted a cognizable privacy interest. The Supreme Court in *Carpenter v. United States*, 585 U.S. 296 (2018), unequivocally held that individuals have a legitimate expectation of privacy in the whole of their movements over time. When the government uses electronic means to gather that information, it engages in a Fourth Amendment "search." When the government engages in a search without first obtaining a warrant, its search is presumptively unreasonable. *See Katz v. United States*, 389 U.S. 347, 360-61 (1967) (Harlan, J., concurring). Because Appellants have sufficiently alleged that the City's long-term aggregation of Appellants' ALPR location data violates their privacy interest in the whole of their physical movements— and because the City has not sought a warrant to collect this information—Appellants have adequately stated a claim under the Fouth Amendment. There is a critical difference between being occasionally seen outside one's home and being constantly watched when outside of it.

The district court erred in narrowly construing *Carpenter* to impose a bright-line rule that only the government's access of cell-site location information (CSLI) or its technological equivalent violates one's legitimate expectation of privacy in the whole of their movements. Such

a reading of *Carpenter* and its progeny is untenable and ignores one of the Fourth Amendment's goals: to place obstacles in the way of a "too permeating" police surveillance.  Fourth Amendment cases—especially ones that involve advanced technologies that did not exist prior to the digital age, such as the ALPRs in this case—must instead be examined as to the particular circumstances of that case and with special attention to the original meaning of the Fourth Amendment.

The question of whether any particular ALPR scheme violates an individual's legitimate expectation of privacy by retroactively revealing their movements largely depends on how much data is collected, how often it is collected, and how long it is kept.  This is necessarily a fact-intensive determination that should not be decided in connection with a motion to dismiss.  Appellants should be granted discovery to resolve these factual questions.  It is enough for now, however, that Appellants have sufficiently alleged facts rising above the speculative level in support of their claim that the City's ALPR scheme violates their privacy interest in the whole of their movements over time.

The district court's dismissal should be reversed.

13

## ARGUMENT

### I. APPELLANTS HAVE STATED A CLAIM THAT THE ALPR PROGRAM VIOLATES THEIR FOURTH AMENDMENT RIGHT TO PRIVACY

The continuous, long-term tracking of Appellants' movements through the aggregation of retrospective ALPR data violates Appellants' reasonable expectations of privacy and constitutes a warrantless and unconstitutional search under the privacy-based approach to the Fourth Amendment articulated in *Katz*, 389 U.S. at 360-61 (1967) (Harlan, J., concurring). The Fourth Amendment protects the people's right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," absent a warrant supported by probable cause. U.S. Const. amend. IV. The "basic purpose" of this Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Ct. of S.F.*, 387 U.S. 523, 528 (1967).

The government engages in a "search" within the meaning of the Fourth Amendment whenever it intrudes upon something an individual seeks to preserve as private, so long as society is prepared to recognize the privacy interest as reasonable. *Kyllo v. United States*, 533 U.S. 27, 33 (2001) (citing *Katz*, 389 U.S. at 360-61). Official intrusion into the

14

individual's privacy is presumptively unreasonable absent a warrant. *See United States v. Karo*, 468 U.S. 705, 714-15 (1984); *see also Fuqua v. Turner*, 996 F.3d 1140, 1151 (11th Cir. 2021).

In *Carpenter v. United States*, the Supreme Court held that "individuals have a reasonable expectation of privacy in the whole of their physical movements." 585 U.S. at 310 (citing *United States v. Jones*, 565 U.S. 400, 430 (2012)); *see United States v. Davis*, 109 F.4th 1320, 1329-30 (11th Cir. 2024). The government effectuates a Fourth Amendment "search" when it uses electronic means to gather that information. *Carpenter*, 585 U.S. at 310.

The district court mischaracterized the privacy interest that Appellants assert. Appellants do not challenge the City's mere "collection of their license plate numbers." Doc 90 – Pg 4. Instead, Appellants have stated a Fourth Amendment claim by alleging that the City's collection and retention of ALPR location data for at least three years violates their reasonable expectation of privacy in their physical movements. *See* Doc 50 – Pg 23. In other words, it is the *aggregation* of ALPR location data over an extended period of time that constitutes a "search" under the Fourth Amendment—not any singular, discrete snapshot of a license

15

plate—because such aggregation reveals the "whole" of Appellants' movements as described in *Carpenter*.  585 U.S. at 310.  There is a difference between being occasionally seen and being permanently watched with one's movements permanently stored for years.  The district court's decision makes no distinction between the two.

### A. Appellants Have a Reasonable Expectation of Privacy in Their Physical Movements over Time

Fourth Amendment protections apply in public spaces.  *See, e.g.*, *Katz*, 389 U.S. at 351 (finding a reasonable expectation of privacy in a public phone booth because "the Fourth Amendment protects people, not places.").  "[W]hat [one] seeks to preserve as private, *even in an area accessible to the public*, may be constitutionally protected."  *Id.* at 351 (emphasis added).  Although public exposure may diminish one's privacy expectation, "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere."  *Carpenter*, 585 U.S. at 310.  A diminished privacy expectation is not an eliminated privacy expectation, and the district court's decision fails to acknowledge that fact.  The Fourth Amendment protects publicly visible information because "the sum of one's public movements" "reflects a wealth of detail

16

about her familiar, political, professional, religious, and sexual associates." *Jones*, 565 U.S. at 415-16 (Sotomayor, J., concurring).

As the court below recognized, the Fourth Amendment does not protect a single viewing of a person nor effect what is publicly visible, including a license-plate number. Doc. 90 – Pg 4; *accord United States v. Ellison*, 462 F.3d 557, 561 (6th Cir. 2006). But the government's use of technology to monitor public movements more pervasively can trigger the warrant requirement even if an officer could have, conceivably, conducted the same search in a single instance. *See Carpenter*, 585 U.S. at 314-15. Thus, whether the government may "conduct a search using the license-plate number to access information about the vehicle and its operator that may not otherwise be public or accessible by the police without heightened suspicion" presents a distinct question—particularly when the scope of the search far exceeds a single view. *Ellison*, 462 F.3d at 567 (Moore, J., dissenting).

The Supreme Court confronted the aggregation issue in *Jones*, 565 U.S. at 402. There, police used a GPS tracking device to monitor the movement of Jones's car to within 50 to 100 feet over a 28-day period. *Id.* at 403. The Court held that the search was constitutionally unreasonable

17

because placing the device on the vehicle was a physical trespass, which obviated the need for the Court to rule on the "vexing problems" associated with the aggregation of data. *Id.* at 412-23. A majority of the Justices wrote separately, though, and concluded that Jones had a reasonable expectation of privacy in his vehicle's movements over time.

Justice Sotomayor explained that the government's compiling of a "comprehensive record of a person's public movements" violates a reasonable expectation of privacy and is, therefore, a search. *Id.* at 415 (Sotomayor, J., concurring). "And because GPS monitoring is cheap in comparison to conventional surveillance techniques and, by design, proceeds surreptitiously, it evades the ordinary checks that constrain abusive law enforcement practices: 'limited police resources and community hostility.'" *Id.* (quoting *Illinois v. Lidster*, 540 U.S. 419, 426 (2004)).

Justice Alito, joined by Justices Ginsburg, Breyer and Kagan, wrote separately to highlight the constitutional problems with using technology to prolong the duration of a search:

> [T]he use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply

18

> could not—secretly monitor and catalogue every single movement of an individual's car for a very long period.

*Id.* at 430 (Alito, J., concurring).

These concerns became the holding of the Court six years later in *Carpenter*, 585 U.S. at 310-11. *Carpenter* held that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through" digital surveillance—regardless of whether those movements were disclosed to the public. *Id.* at 310.

*Carpenter* confronted "how to apply the Fourth Amendment to … the ability to chronicle a person's past movements through the record of his cell phone signals." *Id.* at 309. "Much like GPS tracking of a vehicle," the Court concluded, tracking a person's movement based on cell-site data reveals information about the person's movement that "is detailed, encyclopedic, and effortlessly compiled." *Id.* The Court was concerned both with the duration of the search and how its retrospective nature allowed the government to compile location data over time:

> [T]he retrospective quality of the data here gives police access to a category of information otherwise unknowable. In the past, attempts to reconstruct a person's movements were limited by a dearth of records and the frailties of recollection. With access to CSLI, *the Government can now travel back in time to retrace a person's whereabouts*, subject only to the retention policies of the wireless carriers, which currently maintain records for up to five years. Critically, because

location information is continually logged … this newfound tracking capacity runs against everyone.  Unlike with the GPS device in Jones, police need not even know in advance whether they want to follow a particular individual, or when.

*Id.* at 312 (emphasis added).  "Whoever the suspect turns out to be," when a crime occurs, the City's surveillance system has already "tailed" the suspect "every moment of every day for five years, and the police may— in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment."  *Id.*

Even if an individual voluntarily discloses such location information to third parties, and even if the government can only pinpoint a person's "location within 50 meters," the Court ruled, the government's monitoring of a suspect's cell-site location through his telephone records for a period of four months, "was a search within the meaning of the Fourth Amendment." *Id.* at 315-16.  Because it is a search, "the Government must generally obtain a warrant supported by probable cause *before* acquiring such records."  *Id.* at 316 (emphasis added).

Other courts have reached similar conclusions about the government's prolonged use of cameras in public spaces.  The cameras that Baltimore Police used in *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021), could not see inside the

20

home, but it was enough that aerial cameras tracked "shorter snippets" of people's public movements over "12-hour increments," enabling "photographic, retrospective location tracking," which was "enough to yield 'a wealth of detail,' greater than the sum of the individual trips." *Id.* at 342 (quoting *Jones*, 565 U.S. at 415-17 (Sotomayor, J., concurring)). "*Carpenter* held those deductions go to the privacies of life, the epitome of information expected to be beyond the warrantless reach of the government." *Id.* As in *Carpenter*, Baltimore police could "deduce such information only because it recorded everyone's movements." *Id.* Therefore, the surveillance of public movements "opens 'an intimate window' into a person's associations and activities, [so] it violates the reasonable expectation of privacy individuals have in the whole of their movements." *Id.*

In *Schmidt v. City of Norfolk*, the court denied a motion to dismiss a Fourth Amendment challenge by motorists to the City of Norfolk's widespread location tracking via ALPRs. No. 2:24-CV-621, 2025 WL 410080 (E.D. Va. Feb 5, 2025). The court recognized that "[t]he Supreme Court has unequivocally acknowledged that an individual's subjective and reasonable objective expectations of privacy include privacy in the

21

whole of their physical movements." *Id*. at \*5. It was thus "plausible that Plaintiffs subjectively believe they have a reasonable expectation of privacy that is being violated because the Flock camera system is creating a drag-net system of surveillance that effectively tracks the whole of Plaintiffs' physical movements." *Id*. at \*6. The City of Norfolk's use of ALPRs was comparable to the collection of CSLI in *Carpenter* "found to clearly violate society's expectation of privacy: law enforcement secretly monitoring and cataloguing the whole of tens of thousands of individual's [*sic*] movements over an extended period." *Id*. at \*7.

The Massachusetts Supreme Judicial Court has also addressed the circumstances presented here and held that unfettered law enforcement access to years of ALPR data violates the Fourth Amendment. *See Commonwealth v. McCarthy*, 142 N.E.3d 1090, 1103 (Mass. 2020). Massachusetts placed ALPRs on two bridges—the only points of entry for those seeking to enter Cape Cod by car. *Id*. at 1096. While the Court ultimately held that the ALPR usage did not amount to a Fourth Amendment search *in that particular case*, its conclusion turned on the fact that Cape Cod is sufficiently large that the Commonwealth could not be deemed to know a driver's location simply because it knew that the

driver was somewhere on Cape Cod. *Id.* at 1104-06. The Court warned that "advancing technology undercuts traditional checks on an overly pervasive police presence because it (1) is not limited by the same practical constraints that heretofore effectively have limited long-running surveillance, (2) proceeds surreptitiously, and (3) gives police access to categories of information previously unknowable." *Id.* This police presence can invade a "recognized [] privacy interest in the whole of one's public movements" "[w]hen collected for a long enough period[.]" *Id.* at 1101-02 (citation omitted).

Applying these principles to ALPRs, the court in *McCarthy* explained that: "With enough cameras in enough locations, the historic location data from an ALPR system in Massachusetts would invade a reasonable expectation of privacy and would constitute a search for constitutional purposes." *Id.* at 1104. Importantly, the court emphasized that "[i]n determining whether a reasonable expectation of privacy has been invaded, it is not the amount of data that the Commonwealth seeks to admit in evidence that counts, but, rather, *the amount of data that the government collects or to which it gains access.*" *Id.* (emphasis added).

23

**B. Marco Island's ALPR Scheme Violates Appellants' Reasonable Expectation of Privacy in Their Physical Movements over Time**

Like the long-term collection of time-stamped CSLI data in *Carpenter*, the City's collection and retention of ALPR location data "provides an intimate window" into Appellants' lives that can reveal "not only [their] particular movements, but through them [their] 'familial, political, professional, religious, and sexual associations.'" *Carpenter*, 585 U.S. at 311 (citing *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)).

Appellants have set forth detailed factual allegations in support of their claim, as follows. The City operates at least three stationary ALPRs and one mobile unit, positioned to ensure complete coverage of all vehicular traffic on the island. Doc 50 – Pg 9. These ALPRs capture millions of images each year. Doc 50 – Pg 7. The City has been photographing and recording Appellants' precise location multiple times per day since April 2021. Doc 50 – Pg 2. The City retains that information in an easily retrievable form for at least three years, and it shares that information with other law-enforcement agencies. Doc 50 – Pg 14. Because Appellants must use their cars to commute to work and carry out other activities essential to their daily lives, driving past the

24

ALPRs is unavoidable.  Doc 50 – Pg 16-18.  And because of the nature of Appellants' travels, the City can glean highly detailed information about Appellants' daily routines—including where and when they work, whether they are on or off the Island at any particular time, and with whom they associate.  Doc 50 – Pg 15.

The City's compilation of Appellants' whereabouts over a three-year interval "implicates privacy concerns far beyond" those that would arise if the City just took a single photo of Appellants' vehicles or even if it had law enforcement officers follow Appellants throughout the City for a single day.  *Carpenter*, 585 U.S. at 315; *cf. United States v. Rubin*, 556 F. Supp. 3d, 1129 (N.D. Cal. Aug. 25, 2021) (finding ALPR use was not a search when record revealed only a handful of images in a month) (relying on *United States v. Yang*, 958 F.3d 851, 863 (9th Cir. 2020) (Bea, J., concurring) ("Despite its 5 billion total records, the LEARN database contained a single entry for the Yukon that Yang had rented.") (emphasis added)).

This is especially true given the unique geographical nature of Marco Island, including the fact that it is so small and that Appellants must enter and exit the island by car virtually every day—and thus must

25

surrender to ALPR tracking each time they drive across one of the bridges. *Cf. McCarthy,* 484 Mass. at 1105 (concluding that suppression was not necessary where government used only "four cameras placed at two fixed locations on the ends of the Bourne and Sagamore bridges" in Cape Cod, monitored for only three months.). The ALPRs on the bridges, strategically placed to ensure 100% coverage, combined with the mobile unit mounted on the squad car—which on its own can take millions of photographs—put Appellants and other residents of Marco Island under "near perfect surveillance." *Carpenter*, 585 U.S., at 312; *see also Beautiful Struggle*, 2 F.4th at 340-42 (holding that Baltimore surveillance program, under which it retained for 45 days photographs taken by planes flying over city for 40 hours each week and obtained coverage of around 90% of the city, likely violated Fourth Amendment).

By gathering data regarding the whole of Appellants' movements, the City is provided an "intimate window" into each Appellant's life. *Carpenter*, 585 U.S. at 311. The City's ALPR program permits it to discern not only Appellants' physical movements but also infer detailed information about where and when they work, whether they are in town or away on vacation, and with whom they associate. *See Kyllo*, 533 U.S.

26

at 36, n.4. For example, if several houses of worship are located on the far side of one of the bridges, the City can reasonably infer that an individual is attending one house of worship if an individual crosses the bridge at 8:45 a.m. every Saturday morning and crosses back at 10:45 a.m., and that the individual is attending a different house of worship if the crossings occur at those same times on a Sunday morning. Doc 50 – Pg 15.

Like the cell-phone location data in *Carpenter*, ALPR data is generated entirely involuntarily. *Carpenter*, 585 U.S. at 312. Like carrying a cell phone, traveling in a car on highways is an indispensable feature of contemporary life. Like the phone data in *Carpenter*, ALPR data is historical and searchable, allowing authorities to simply track everyone and later decide whom among the population to investigate. *Id.* Like cell phones, license plates and the automobiles they are affixed to are specifically associated with the owner of the property being tracked. *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1113 (N.D. Ohio 2025) ("Although ALPR photos cannot identify the driver inside the car, common sense dictates that the registered owner of a personal vehicle … will usually be the driver of the car.").

27

The court below focused on the fact that ALPR data captures the movement of the car and not movements once an individual exits the car. Doc 90 – Pg 4. To be sure, the facts underlying the Fourth Amendment claim in *Carpenter*—police sought a suspect's cell-site records for a seven-day period—differ from those at issue here. *See Carpenter*, 585 U.S. at 302. But many of those differences suggest that the City of Marco Island intrudes more severely on privacy rights. Appellants have been the targets of daily surveillance for a far longer period—beginning in April 2021— and the City will retain all their ALPR data for at least three years. Doc 50 – Pg 2. The *Carpenter* cell-site records provided more frequent location information on any single day than do the City's ALPR data, but the latter's location information is far more accurate: The *Carpenter* cell-site records could provide only an approximation of the target's location, by placing the target within a "wedge-shaped sector ranging from one-eighth to four square miles." *Carpenter*, 585 U.S. at 312. In contrast, the City's ALPR information discloses Plaintiffs' precise

28

locations several times per day—not a mere approximation. Doc 50 – Pg 9-10. [3]

The district court also relied on *United States v. Sturdivant* for the proposition that "[u]nlike a cell phone, a car does not track nearly exactly the movements of its owner." *See* 786 F. Supp. 3d 1098, 1112 (N.D. Ohio 2025) (citing *Carpenter*); Doc 90 – Pg 5. In that case, however, the court highlighted the ways in which ALPRs may intrude on privacy in more significant ways than CSLI, stating that "automatic license plate reader data can be more granular than cell-site location information" because ALPR photographs supply "richer visual information about the car and its surroundings." *Sturdivant*, 786 F. Supp. 3d at 1113. One might say

---

[3] Moreover, it is unlikely the cell-site information in *Carpenter* could even track the defendant's movements within private spaces or determine the private space in which the defendant was located. *See Carpenter,* 585 U.S. at 312; *see also* Orin Kerr, "Implementing Carpenter," in *The Digital Fourth Amendment* (manuscript at 12) (explaining that the records in *Carpenter* did not "pinpoint precisely where the phone was located" but only provided "rough neighborhood information."). The City can pinpoint Plaintiffs' movements just as accurately. Doc 50 – Pg 9. If, for example, an ALPR shows that Appellant Shannon Schemel has driven her car onto Marco Island and has not been photographed driving off the Island, then the City knows with 100% confidence that she is somewhere within the several square miles comprising Marco Island.

a picture is worth a thousand CSLI data points.  Moreover, the court in *Sturdivant* warned that advanced ALPR systems that operate retroactively (*i.e.*, without advance suspicion) may present "dragnet type law enforcement practices" amounting to a Fourth Amendment search. *Id.* at 1114 (citing *United States v. Knotts*, 460 U.S. 276, 284 (1983)).

Indeed, the government's collection of ALPR data is in many ways *more concerning* than its use of cell-phone data in *Carpenter*.  Here, all the ALPR data is in the hands of the State in the first instance—in *Carpenter*, the data was in possession of the phone companies, and the government had to specifically request the records of the specific suspect. *See Carpenter*, 585 U.S. at 302.

As the *en banc* Fourth Circuit recognized in *Leaders of a Beautiful Struggle*, the government's use of cameras to photograph and catalogue movements along public roads is "[m]ore like the CSLI in *Carpenter* and GPS-data in *Jones* than the radio-beeper in *Knotts*," because the system creates "a 'detailed, encyclopedic,' record of where everyone came and went[.]"  2 F.4th at 341.  A database of photographs allows the government to "'travel back in time' to observe a target's movements,

30

forwards and backwards." *Beautiful Struggle*, 2 F.4th at 341 (citing *Carpenter*, 585 U.S. at 312).

The district court incorrectly held that the City's ALPRs "hardly compare" to the CSLI in *Carpenter* because "they merely record data concerning vehicles, not cell phones," and "tell very little about a person's movements." Doc 90 – Pg 5. The court's inappropriate and inaccurate pre-discovery characterization of the City's ALPR program severely understates the amount of information the City can glean and deduce about Appellants' daily lives through the long-term aggregation of its ALPR data. *See Leaders of a Beautiful Struggle*, 2 F.4th at 343 (explaining that Baltimore's Air Investigation Research surveillance program provided enough information for law enforcement to "deduce the people behind the pixels.").

***

As the courts have recognized in *Jones*, *Carpenter*, *Beautiful Struggle* and other cases, the compilation of location data reveals a lot about a person's life and their associations. The long-term compilation and aggregation of ALPR data is no different. The City's collection and retention of Appellants' ALPR data for at least three years violates the

31

reasonable expectation of privacy Appellants have in the "whole of their physical movements" over time and thus constitutes a "search" within the meaning of the Fourth Amendment. *Carpenter*, 585 U.S. at 310.

II.    **APPELLANTS HAVE SUFFICIENTLY ALLEGED THAT THE CITY'S ALPR SCHEME EFFECTUATES A "TOO PERMEATING POLICE SURVEILLANCE" THAT THE FOURTH AMENDMENT WAS DESIGNED TO IMPEDE**

The City's intrusive ALPR scheme exemplifies the type of widespread, suspicionless surveillance the Fourth Amendment was specifically designed to guard against. Although no single rubric definitively resolves which expectations of privacy are entitled to protection, the analysis is informed by historical understandings "of what was deemed an unreasonable search and seizure[.]" *Carpenter*, 585 U.S. at 305 (citation omitted). Even "[a]s technology has enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes," the Supreme Court "has sought to assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* (cleaned up, citation omitted). After all, "a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'" *Id.* (citation omitted).

### A. Distinguishing *Carpenter* Based Only on the Means Used to Gather Information Fails to Account for Technological Advances, the Length of Time Gathered Information Is Kept, and the Limitations of the Fourth Amendment

By distinguishing *Carpenter* based solely on the purported technical differences between CSLI and ALPR data and holding that the City's use of ALPRs does not violate Appellants' legitimate expectation of privacy in their physical movements, the district court erred in focusing only on the *means* by which the government gathers data instead of the specific contours of Appellants' Fourth Amendment privacy rights. *See Leaders of a Beautiful Struggle*, 2 F.4th at 345 (explaining that the "cell phone technology is ultimately incidental to the outcome in *Carpenter*."). The Fourth Amendment principles outlined in *Carpenter* should not be confined to the narrow set of facts in that specific case.

The district court should have examined, more generally, whether the City's ALPR program effectuates a "too permeating police surveillance" the Fourth Amendment was designed to impede. *Carpenter*, 585 U.S. at 305. After all, the privacy-based approach of the Fourth Amendment "limits the government's ability to exploit technological advances." *United States v. Lewis*, 38 F.4th 527, 534 (7th Cir. 2022) (citing *Kyllo*, 533 U.S. at 34-35). This character of constantly

33

modernizing technology—its lower and sometimes negligible cost combined with 24-hour surveillance capability—creates the Fourth Amendment violation. *See e.g., Jones*, 565 U.S. at 415-16 (Sotomayor, J., concurring). Historically, a government that wished to track its citizens had to devote large resources to having them followed. That is no longer the case: While a police officer needs to be paid and to sleep, eat, and take breaks, an automized, robotic camera does not. *See id.* at 416.

In *Knotts,* the Supreme Court held that the government's use of a "beeper" to aid in tracking a single vehicle through traffic did not constitute a "search" under the Fourth Amendment. 460 U.S. at 281. While the beeper augmented police's visual surveillance of Knott's vehicle, the vehicle's route had been "voluntarily conveyed to anyone who wanted to look" at the public roads—and thus Knotts could not assert a privacy interest in the information obtained from the beeper. *Id.* But the Court in *Knotts* recognized that "twenty-four-hour surveillance of any citizen of this country['s]" public movements would present an entirely different constitutional question. *Id.*

*Carpenter* did not create merely a specific rule against government access to cell-site records without a warrant. Rather, it held that law-

34

enforcement personnel violated Carpenter's Fourth Amendment rights because the cell-site records it obtained "provide[d] an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Carpenter*, 585 U.S. at 311 (quoting *Jones*, 565 U.S. at 415 (Sotomayor, J., concurring)). The Court expressly stated that "different [Fourth Amendment] principles" should apply to "the more sophisticated surveillance" developed in ensuing decades. *Id*. at 307. Importantly, it warned that new technologies risk creating a too permeating surveillance when it gives the government access to "a category of information otherwise unknowable." *Id*. at 312.

The *Carpenter* Court's analysis of the CSLI data at issue thus turned on two key factors: (1) whether the government used a digital technology to obtain information that would have been impossible to obtain without that technology, and (2) whether that information reveals the "privacies of life." *Carpenter*, 585 U.S. at 311-13; *see also* Orin Kerr, "Implementing Carpenter," in *The Digital Fourth Amendment* (manuscript at 10) (Explaining that *Carpenter* works at high level of generality and asks whether "police traditionally have easy access to

detailed location tracking records" and whether they "have that access today."); *see also Beautiful Struggle*, 2 F.4th at 341 ("*Carpenter* solidified the line between short-term tracking of public movements—akin to what law enforcement could do 'prior to the digital age'—and prolonged tracking that can reveal intimate details through habits and patterns." (cleaned up)).

The City's use of ALPRs satisfies each of those factors. First, as explained in the preceding section, the aggregation of ALPR data over an extended period of time reveals the "privacies of life" by compiling a massive database containing detailed records of the physical movements of all individuals whom the ALPRs photograph. Doc 50 – Pg 10; *See Carpenter*, 585 U.S. at 305. Second, the gathering of such detailed records would have been impossible to effectuate prior to the digital age, and without the use of ALPRs. *See Jones*, 565 U.S. at 416 (Sotomayor, J., concurring).

The City's ALPRs are not comparable to the outdated analog of the radio-beeper device in *Knotts* simply because both devices track movements on public roads. *See Knotts*, 460 U.S. at 281-82. ALPRs are a technological innovation that enhance the government's surveillance

abilities to an extent that "erode[s] the privacy guaranteed by the Fourth Amendment." *Kyllo*, 533 U.S. at 34 (2001) (concluding that technology "not in general public use" implicates a reasonable expectation of privacy). The City's ALPRs are capable of recording *thousands* of license plate images *per minute*. Doc 50 – Pg 5. They are "on" 24 hours a day, seven days a week—in other words, they are constantly surveilling. Doc 50 – Pg 9. The ALPR cameras are connected to systems that convert photographs of license plates into computer-readable data; the license plate number as well as the date, time, and precise location of the observation are recorded. Doc 50 – Pg 5, 16. The information is compiled and kept for years to be put to use whenever the government wishes. Doc 50 – Pg 14.

This level of information-gathering and data retention vastly exceeds what law enforcement personnel could gather with traditional surveillance tools. Such constant surveillance and storage of information would have been impossible to effectuate prior to the digital age and would certainly have been impossible to even imagine at the Founding. *See United States v. Smith*, 110 F.4th 817, 841 (5th Cir. 2024) ("Our panel decision today endeavors to apply our Founding charter to the realities

37

of modern technology, consistent with governing precedent.") (Ho, J., concurring).[4]

## B. *Carpenter* and Post-*Carpenter* Cases Have Cautioned Against Dragnet-Type Surveillance Systems Like the City's ALPR Scheme

In *Knotts*, the Court imposed guardrails on warrantless public surveillance by rejecting "dragnet type law enforcement practices." *Knotts*, 460 U.S. at 283-284.  The Supreme Court and lower courts have continued to admonish against the government's attempts to carry out widespread warrantless and suspicionless surveillance schemes.  The *Carpenter* Court recognized that one of the dangers of CSLI is that it "runs against everyone."  *Carpenter*, 585 U.S. at 312.  "Unlike with the GPS device in *Jones*, police need not even know in advance whether they want to follow a particular individual, or when."  *Id*.  And the Fifth Circuit has noted that the 24-hour warrantless tracking of charter-boats by the government can raise serious Fourth Amendment concerns, "given

---

[4] Perhaps, near the Founding, only Jeremy Bentham imagined this level and degree of surveillance.  He coined the term "Panopticon" to denote a prison wherein all inmates would be subject to 24-hour surveillance by an unseen observer.  *See* Jeremy Bentham, *Panopticon, or the Inspection House* (1791).  But he *never* suggested such a system for free men as a routine part of everyday life.

38

the Supreme Court's instruction that members of the public have a "'reasonable expectation of privacy in the whole of their movements.'" *Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 970 (5th Cir. 2023) (citing *Carpenter*, 585 U.S. at 310)).

Similarly, ALPRs placed near sensitive locations can 'reveal … an individual's life and associations" and "allow the police to reconstruct people's past movements *without knowing in advance* who police are looking for, thus granting police access to 'a category of information otherwise [and previously] unknowable.'" *Commonwealth v. McCarthy*, 484 Mass. at 1104 (emphasis added) (citing *Carpenter*, 585 U.S. at 311-12). The ALPRs in this case collect and retain data on every resident and visitor to Marco Island, and they do so without any particularized showing of suspicion. *See* Doc 50 – Pg  15.

Indeed, the City has stated that it intends to use the ALPR data it gathers to "[proactively] reduce crime and traffic incidents before they occur." Doc 50 – Pg 9. As Judge Bea recognized in *United States v. Yang*, larger-scale ALPR programs create serious privacy concerns because "ALPRs can effortlessly, and automatically, create voluminous databases of vehicle location information" and can collect such information "without

39

individualized suspicion." *United States v. Yang*, 958 F.3d at 863.  The

majority of federal cases that have held that collection of ALPR data did

not amount to a Fourth Amendment search arose in the criminal context

and involved ALPR data collected as to a specific criminal defendant *after*

law enforcement officials had reasonable articulable suspicion that the

defendant's vehicle was involved in a crime.  *See e.g., Rubin*, 556 F. Supp.

at 1124 (N.D. Cal. Aug. 25, 2021); *United States v. Toombs*, 671 F. Supp.

3d 1329, 1335 (N.D. Ala. 2023); *United States v. Jiles*, No. 8:23-CR-98,

2024 WL 891956 (D. Neb. Feb. 29, 2024); *United States v. Sturdivant*,

786 F. Supp at 1113.

For example, in *United States v. Toombs*, the court affirmed a

magistrate judge's recommendation to deny a motion to suppress

evidence obtained through the use of an ALPR system where there was

sufficient reasonable suspicion to detain the defendant regardless of the

ALPR use.  671 F. Supp. 3d at 1335.  There, a law enforcement officer

collected the defendant's ALPR data only *after* personally observing the

defendant's vehicle attempt to evade the officer's interdiction operation

on an interstate.  *Id*. at 1335-37.  And the ALPR data the officer collected

40

from the system was limited to one single "viewing" of the license plate on the interstate from that same day. *Id.* at 1336.

Similarly, in *United States v. Rubin*, Police used an ALPR to identify a vehicle's owner *after* surveillance video captured that vehicle fleeing the scene of a robbery, where the male suspect was seen getting into the passenger side of the vehicle. 556 F. Supp. 3d at 1124. Law enforcement officers entered the vehicle's license plate number into an ALPR system, which determined that the vehicle belonged to the defendant and provided location information for the vehicle on only a handful of occasions. *Id.* at 1125. The district court held that such "limited information" about the suspect derived from accessing the ALPR database did not amount to a Fourth Amendment "search," explaining that the database "did not provide significant information of value" and that "the information was not remotely comparable to the 'detailed, encyclopedic' information at issue in *Carpenter* … Unlike the cell-site location records there, the data here provided no more information than what could have been obtained through police surveillance." *Id.* at 1129-30 & n.3 (quoting *Carpenter*, 585 U.S. at 308-09)).

41

*Carpenter* itself involved a targeted investigation of a single suspected criminal. *Carpenter*, 585 U.S. at 301-03. The government in *Carpenter* sought the CSLI data only after it had particularized suspicion that the defendant had committed a crime. *Id.* In contrast, the City's surveillance program is vastly larger in scope and duration and entails long-term maintenance of personal information regarding every resident of Marco Island, including law-abiding citizens like Appellants.[5]

In *United States v. Sturdivant*, the court noted that ALPR cameras "indiscriminately capture every vehicle that passes them." 786 F. Supp. 3d at 1113. The court there specifically warned that the day ALPR surveillance presents "dragnet type law enforcement practices" amounting to a Fourth Amendment search "might well be on the

---

[5] ALPR surveillance is also different from targeted surveillance of criminal suspects via pole cameras. *See United States v. Gregory*, 128 F.4th 1228, 1236, 1241 (11th Cir. 2024) (holding use of pole cameras to surveil criminal defendant's home, where camera could not reveal anything more than what was visible from the public street, did not violate any expectation of privacy); *see also United States v. Tuggle*, 4 F.4th 505, 516 (7th Cir. 2021) (holding no Fourth Amendment search in the isolated use of pole cameras directed at home of defendant suspected of drug trafficking). As the Court in *Leaders of a Beautiful Struggle* explained, cases such as those "all involve some discrete operation surveilling individual targets." 3 F.4th at 345. Not so here.

horizon," because any further "qualitative leap[s] forward" in the collection of ALPR data places "the evidence generated from such technology at risk in the absence of a warrant." *Id.* at 1114.

Here, the City's warrantless and suspicionless collection and retention of Appellants' ALPR records spanning at least three years and containing hundreds, if not thousands, of photographs of their vehicles takes that "qualitative leap forward" and presents a permeating "dragnet type law enforcement" practice that is constitutionally suspect under the Fourth Amendment. *Id.* at 1114; *see Jones*, 565 U.S. at 416 (warning that giving the government "unrestrained power to assemble data that reveal private aspects of identity" as to anyone whom it, "in its unfettered discretion, chooses to track" may "alter the relationship between citizen and government in a way that is inimical to democratic society.") (quotations omitted); *see also United States v. Cuevas-Sanchez*, 821 F.2d 248, 251 (5th Cir. 1987) (recognizing that long-term and "indiscriminate … surveillance [even in areas of plain view] raises the specter of the Orwellian state.").[6]

---

[6] The City's ALPR scheme in some ways resembles the "reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for

43

## III. APPELLANTS HAVE MET THEIR BURDEN AT THE MOTION TO DISMISS STAGE

As noted, "the threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is exceedingly low." *Quality Foods de Centro America v. Latin American Agribusiness Dev. Corp.*, 711 F.2d 989, 995 (11th Cir. 1983). In assessing the sufficiency of a claim on a motion to dismiss, a court must "accept all well-pleaded allegations as true and draw all reasonable inferences in the plaintiff's favor." *Smith*, 873 F.3d at 1351 (11th Cir. 2017). Detailed facts are not required—a complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *United States v. Baxter Intern., Inc.*, 345 F.3d 866, 881 (11th Cir. 2003).

---

evidence of criminal activity." *Smith*, 110 F.4th at 836 (citing *Riley v. California*, 573 U.S. 373, 403 (2014)); *see also* Philip Hamburger, *Is Administrative Law Unlawful?* 186 (2014) (explaining that the sweeping rejection of general warrants sparked the fires of the American Revolution). The City and law enforcement officials can theoretically query the ALPR data it has collected without any particularized showing of suspicion to look for evidence of a traffic infraction or crime. Doc 50 – Pg 17. The ALPR program thus "'work[s]' in reverse' from traditional search warrants," because rather than "authorizing surveillance of a known suspect," it "conduct[s] sweeping searches of" every vehicle that enters or exits Marco Island. *Smith*, 110 F.4th at 822.

44

A court should deny a motion to dismiss if the complaint includes "sufficient factual matter" that, if "accepted as true," states a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. at 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 570 (2007)). Under Rule 12(b)(6), the standard is whether a plaintiff's allegations are sufficient to allow the case to proceed to discovery in an attempt to prove his claims, not whether the plaintiff will ultimately prevail in those claims. *See Jackam*, 800 F.2d at 1579.

## A. Appellants Should Have the Opportunity to Engage in Discovery as to the Fact-Intensive Issues in this Case

Fourth Amendment cases are necessarily fact intensive. *See United States v. Maynard*, 615 F.3d 544, 566 (D.C. Cir. 2010) ("Fourth Amendment cases must be decided on the facts of each case, not by extravagant generalizations.") (citing *Dow Chemical Co. v. United States*, 476 U.S. 227, 238 n.5 (1986)). Indeed, many of the cases assessing whether a "search" occurred with ALPR technology have expressly limited their holdings to the record before it but have suggested that long-term ALPR surveillance could amount to a search depending on the circumstances of a particular case. *See e.g., Sturdivant,* 786 F. Supp. 3d at 1113 ("On different facts, law enforcement could use ALPR more

45

invasively to uncover a target's personal habits or other intimate details."); *United States v. Brown*, No. 19-CR-949, 2021 WL 4963602, at *3 (N.D. Ill. Oct. 26, 2021) (recognizing that "aggregating and then accessing even entirely public travel can invade a reasonable expectation of privacy in the whole of someone's physical movements," but denying motion to suppress where ALPR captured criminal defendant's vehicle 23 times over a span of less than three months); *United States v. Jackson*, No. 24-CR-10010-JWB, 2025 WL 1530574, at *9 (D. Kan. May 29, 2025) (highlighting the court's concerns with the "aggregation and searchability of the photos" taken by an ALPR system but concluding that "the limited nature of the photographs taken in this case and the 30-day limitation on retention of photographs assuages the court's concerns at this time.").

As these cases and Judge Bea's concurrence in *United States v. Yang* recognize, whether warrantless ALPR surveillance violates the Fourth Amendment largely depends on *how much* data is collected and *for how long it is kept*. *See Yang*, 958 F.3d at 863-64. At this stage in litigation, before Appellants have had an opportunity for discovery, such questions of fact must be resolved in Plaintiffs' favor. *See Smith*, 873

46

F.3d at 1351. What is done with the vast repository of information may also have bearing on the intrusion on Appellants' privacy interests.

This Court's opinion in *United States v. Mapson* is instructive. In *Mapson*, three sisters appealed their convictions on charges stemming from an elaborate murder plot. 96 F.4th at 1327–28. At trial, the government introduced "reports from online databases showing that ALPRs captured a license plate matching the one on [another sister's] vehicle traveling in Alabama (and elsewhere) at suspiciously coincidental times and locations in relation to the shooting," even though that sister did not live in Alabama. *Id.* at 1333. The vehicle owner moved to exclude ALPR evidence as the fruit of a warrantless Fourth Amendment search. *Id.* The trial court denied that motion, holding that she "did not have an expectation of privacy as to her tag or the exterior of her vehicle[.]" *Id.*

On appeal, the Eleventh Circuit did not rely on that reasoning to uphold the use of ALPR evidence. Rather, the Court noted that the government investigator accessed ALPR data at issue several days before the Supreme Court's decision in *Carpenter* abrogated then-valid Eleventh Circuit precedent categorically allowing warrantless access to a suspect's historical location data. *Mapson*, 96 F.4th at 1335 (citing

47

*United States v. Davis*, 785 F.3d 498, 513 (11th Cir. 2015) (*en banc*)). Thus, the Court assumed without deciding that warrantless acquisition of ALPR data violated the Fourth Amendment under *Carpenter* but held that the good-faith exception to the exclusionary rule nonetheless allowed the government to introduce pre-*Carpenter* ALPR evidence. *Id.*

*Mapson*'s decision to rely on the good-faith exception rather than the trial court's reasoning—which is identical to the City's argument here—reveals the Eleventh Circuit's unwillingness to grant what the City seeks: a blanket rule that ALPR surveillance is not a Fourth Amendment search. *See* Doc 90 – Pg 1-2. Instead, as Appellants have explained, the constitutionality of an ALPR program depends on a fact-intensive examination of the extent to which the program gathers information about an individual's life. *See Carpenter*, 585 U.S. at 310-13. Such a fact-specific issue is not appropriately decided in connection with a motion to dismiss.

Moreover, in *Raul Mas Canosa v. City of Coral Gables*, the Florida trial court had denied the City of Coral Gables's motion to dismiss a challenge against that city's ALPR surveillance system under the Fourth Amendment. *See* Order on Mots. to Dismiss, *Raul Mas Canosa v. City of*

48

*Coral Gables, et al.*, No. 2018-033927-CA-01 (11th Cir. Ct., Oct. 15, 2019). The trial court drew factual inferences in favor of Mas Canosa to find that Coral Gables's ALPR system collected a "vast quantity of searchable data," *Id.* at 4. It concluded with respect to whether "the City's collection of his ALPR information violates his Florida or Federal rights to privacy," that Mas Canosa "has stated a cause of action and there is no basis under which to grant the motion to dismiss[.]" *Id.* at 15.

The same result is appropriate here, where the Court must also draw all factual inferences in Appellants' favor when assessing the sufficiency of their claims. *See Smith*, 873 F.3d at 1351. Plaintiffs here have had no opportunity for discovery at the motion-to-dismiss stage, and there is no factual record that could support summary judgment. Plaintiffs must have an opportunity for full discovery, including into the extent to which the City's ALPR system captured their historical movements, who had access to the data, how long it has been stored, and what, if anything, has been done with it, which requires the Court to reverse the district court's dismissal.

### B. Prior ALPR Cases upon Which the City and the District Court Rely Have Been Decided on Motions to Suppress, Which Implicate a Different Standard of Review

49

Most of the courts that have held that the collection of ALPR data does not constitute a search under the Fourth Amendment have done so in connection with a motion to suppress and corresponding evidentiary hearing in the context of a criminal prosecution. *See Sturdivant*, 786 F. Supp. 3d at 1114; *United States v. Jiles*, 2024 WL 891956 at \*4; *Toombs*, 671 F. Supp. 3d at 1329; *United States v. Cooper*, No. 23-131, 2025 WL 35035, at \*1 (E.D. La. Jan. 6, 2025); *United States v. Martin*, 753 F. Supp. 3d 454, 468 (E.D. Va. 2024).[7]  The distinction between the procedural posture of those cases and the present one is crucial.

"The evidentiary burden at a suppression hearing is a preponderance of the evidence." *United States v. Sigouin*, 494 F. Supp. 3d 1252, 1261 (S.D. Fla. 2019) (citing *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974)).  A motion to suppress necessarily comes after a discovery period and thus *after* the individual against whom ALPR data

---

[7] The district court cited *Scholl v. Illinois State Police*, which, as this case, was decided in the context of a motion to dismiss. *See* Doc 90 – Pg 6. However, in *Scholl*, the plaintiffs challenged ALPR data collection in the entirety of Cook County, Illinois, a much larger geographical area than Marco Island. *See Scholl v. Illinois State Police*, 776 F. Supp. 3d 701 (N.D. Ill. 2025).  Additionally, the ALPR program there collected data for only up to 120 days—not three years.  The case is now pending appeal in the Seventh Circuit.

is used has had the opportunity to assess the scope and breadth of such data, including the extent to which the government has collected historical location data. That is not the case here.

One of the only other cases to address whether the widespread collection of ALPR data amounts to a search in a non-criminal context, *Schmidt v. City of Norfolk*, denied a motion to dismiss. *See Schmidt*, 2025 WL 410080 at *8. The court there concluded that "the alleged facts and associated reasonable inferences plausibly allege that Plaintiffs believe there is a drag-net system of surveillance, and based on the Supreme Court's holding in *Carpenter*, it is similarly plausible that Plaintiffs believe that there was a violation of their subjective expectation of privacy" and that "a reasonable person could believe that society's expectations, as laid out by the Court in *Carpenter*, are being violated by the Norfolk [ALPR] system." *Schmidt*, 2025 WL 410080 at *6-7. The court recognized that the case contained "many unresolved issues of material fact directly relevant to the determination of whether [the ALPR system]" violates the Fourth Amendment. *Id*. at *8. Because this case likewise requires a fact-intensive examination of the extent to which the

51

City's ALPR program gathers information about Plaintiffs' lives, it should proceed to discovery.

***

At the motion-to-dismiss stage, the Court must draw all reasonable inferences in favor of Appellants. Appellants have plausibly alleged facts to support their claim that the City's ALPR program violates their reasonable expectation of privacy in the whole of their physical movements, which implicates a Fourth Amendment search. Appellants have thus met their burden. Courts addressing the constitutionality of ALPRs have agreed that whether an ALPR program violates the Fourth Amendment is a fact-intensive inquiry and depends on the scope and extent of the historical location data gathered. *See e.g., Sturdivant*, 786 F. Supp. 3d at 1113. The district court's dismissal should thus be reversed, and the case should proceed to discovery.

## CONCLUSION

The Court should reverse the district court's dismissal and remand the case for further proceedings with the amended complaint reinstated.

52

Dated: December 16, 2025　　　Respectfully submitted,

　　　　　　　　　　　　　　/s/ Andreia Trifoi
　　　　　　　　　　　　　　Andreia Trifoi
　　　　　　　　　　　　　　John J. Vecchione
　　　　　　　　　　　　　　Mark S. Chenoweth
　　　　　　　　　　　　　　NEW CIVIL LIBERTIES ALLIANCE
　　　　　　　　　　　　　　4250 N. Fairfax Drive, Suite 300
　　　　　　　　　　　　　　Arlington, VA 22203
　　　　　　　　　　　　　　Telephone: 202-869-5210
　　　　　　　　　　　　　　Andreia.Trifoi@ncla.legal

　　　　　　　　　　　　　　*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of the Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 10,640 words. This brief also complies with the typeface and type-style requirements of the Federal Rules of Appellate Procedure because it was prepared using Microsoft Word in Century Schoolbook, 14-point font, a proportionally spaced typeface.

Dated: December 16, 2025          /s/ *Andreia Trifoi*
                                  Andreia Trifoi

                                  *Counsel for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 16, 2025, I electronically filed the foregoing brief with the Clerk of Court for the United States Cout of Appeals for the Eleventh Circuit by using the CM/ECF system, which sent notification of such filing to all counsel of record.

Dated: December 16, 2025          /s/ *Andreia Trifoi*
                                 Andreia Trifoi

                                 *Counsel for Plaintiffs-Appellants*