CASE NO. 25-13913-E

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

SHANNON SCHEMEL, ET AL.,

*Plaintiffs-Appellants*,

v.

CITY OF MARCO ISLAND, FLORIDA,

*Defendant-Appellee*.

On Appeal from the United States District Court for the Middle District of Florida,
Fort Myers Division, Case No. 2:22-cv-00079-KCD-DNF
Hon. Kyle C. Dudek

## BRIEF OF THE CATO INSTITUTE AS *AMICUS CURIAE*
## IN SUPPORT OF PLAINTIFFS-APPELLANTS

Matthew P. Cavedon
*Counsel of Record*
Brent Skorup
Laura A. Bondank
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
(706) 309-2859
mcavedon@cato.org

*Counsel for Amicus Curiae*

December 23, 2025

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule No. 26.1(a)(6), *amicus* certifies that the following persons have an interest in the outcome:

1. Cavedon, Matthew P., counsel for *amicus curiae*

2. Cato Institute, *amicus curiae*

3. Skorup, Brent, counsel for *amicus curiae*

4. Bondank, Laura A., counsel for *amicus curiae*

The Cato Institute is a nonprofit entity operating under § 501(c)(3) of the Internal Revenue Code. *Amicus* is not a subsidiary or affiliate of any publicly owned corporation and does not issue shares of stock. No publicly held corporation has a direct financial interest in the outcome of this litigation due to *amicus*'s participation.

Respectfully submitted,

Dated: December 23, 2025                 /s/ Matthew P. Cavedon

i

## TABLE OF CONTENTS

**Page(s)**

CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT ................................................. i

TABLE OF CONTENTS ................................................................................ ii

TABLE OF AUTHORITIES ........................................................................... iii

INTEREST OF *AMICUS CURIAE* .................................................................. 1

STATEMENT OF THE ISSUES ...................................................................... 2

INTRODUCTION AND SUMMARY OF ARGUMENT ....................................... 3

ARGUMENT ............................................................................................... 6

    I.   ALPRS REPLICATE THE GENERAL WARRANTS THE
        FOURTH AMENDMENT WAS DESIGNED TO FORBID. ...................... 6

    II.  THE DISTRICT COURT'S DECISION INVITES THE
        GOVERNMENT TO BUILD NETWORKS OF CONTINUOUS
        SURVEILLANCE. ............................................................................ 10

        A.  ALPRs .................................................................................. 11

        B.  Drones ................................................................................. 12

        C.  Security Cameras .................................................................. 16

CONCLUSION .......................................................................................... 18

CERTIFICATE OF COMPLIANCE ............................................................... 19

CERTIFICATE OF SERVICE ....................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. Hicks*, 480 U.S. 321 (1987) ..................................................................8

*Buonocore v. Harris*, 65 F.3d 347 (4th Cir. 1995) ................................................7

*Carpenter v. United States*, 585 U.S. 296 (2018) ............................ 5, 7, 8, 9, 10, 18

*Chimel v. California*, 395 U.S. 752 (1969) ..........................................................10

*Coolidge v. New Hampshire*, 403 U.S. 443 (1971) ..............................................10

*Kyllo v. United States*, 533 U.S. 27 (2001) ..................................................... 8, 11

*Riley v. California*, 573 U.S. 373 (2014) ...................................................... 5, 6, 8, 9

*Silverman v. United States*, 365 U.S. 505 (1961) ................................................11

*Stanford v. Texas*, 379 U.S. 479 (1965) ................................................................6

*Steagald v. United States*, 451 U.S. 204 (1981) .................................................6, 7

*United States v. Knotts*, 460 U.S. 276 (1983) .......................................................5

*United States v. Smith*, 110 F.4th 817 (5th Cir. 2024) ...................................... 9, 10

**Statutes**

Funding Act of 1790, Act of August 4, 1790, ch. 35, § 48, 1 Stat. 145 ...................7

**Other Authorities**

A.J. Vicens & Raphael Satter, *As 'No Kings' protests denounce Trump, surveillance worries emerge*, REUTERS (Oct. 19, 2025, 12:51 PM).....................15

Akela Lacy, *An NYPD Camera Points Directly into Their Bedroom. They're Suing the City Over it.*, THE INTERCEPT (Oct. 28, 2025, 5:00 AM)........17

*Automated License Plate Readers Market Survey Report*, NAT'L URB. SEC. TECH. LAB'Y (June 2025).................................................................................4

Beryl Lipton, *Drones as First Responder Programs Are Swarming Across the United States*, ELEC. FRONTIER FOUND. (June 27, 2024) ......................... 13, 17

*Cell Site Simulators*, NAT'L ASSOC. OF CRIM. DEF. LAWS. (Apr. 28, 2016)............16

Chaim Gartenberg, *Social-distancing detecting 'pandemic drones' dumped over privacy concerns*, THE VERGE (Apr. 23, 2020, 10:51 AM)..........................15

Cybele Mayes-Osterman & Josh Meyer, *Military parade is coming to DC soon. Officials gave a preview of what to expect*, USA TODAY (June 10, 2025, 8:13 AM)..................................................................................................15

Dave Maass, *Data Driven 2: California Dragnet—New Data Set Shows Scale of Vehicle Surveillance in the Golden State*, ELEC. FRONTIER FOUND. (Apr. 22, 2021) ............................................................... 3, 4, 11

Dhruv Mehrotra & Jesse Marx, *The Age of the Drone Police is Here*, WIRED (June 5, 2024, 6:00 AM)..............................................................14

Dhruv Mehrotra & Joey Scott, *Here Are the Secret Locations of ShotSpotter Gunfire Sensors*, WIRED (Feb. 22, 2024, 8:18 PM)..........................16

GEORGE ORWELL, 1984 (1949)............................................................17

Hannah Fry, *Government drones used in 'runaway spying operation' to peek into backyards in Sonoma County, lawsuit says*, L.A. TIMES (June 6, 2025, 6:06 PM) ..........................................................................15

Helen Webley-Brown et al., *ShotSpotter and the Misfires of Gunshot Detection Technology*, SURVEILLANCE TECH. OVERSIGHT PROJECT (July 14, 2022) ..................................................................................16

Jake Offenhartz, *New York police will use drones to monitor backyard parties this weekend, spurring privacy concerns*, ASSOC. PRESS (Aug. 31, 2023, 7:53 PM) ..........................................................................15

Jason Koebler & Joseph Cox, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows*, 404 MEDIA (May 27, 2025, 9:36 AM)...............12

Jay Stanley, *Eye-in-the-Sky Policing Needs Strict Limits* ACLU (July 27, 2023) .......................................................................... 13, 14

Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON (Feb. 7, 2023) ............................................................5

Jessica Dwyer-Moss, *The Sky Police: Drones and the Fourth Amendment*, 81 ALB. L. REV. 1047 (2017–2018)............................................. 12, 13

iv

Matt Powers, *Michigan Supreme Court Creates Giant Loophole for Warrantless Surveillance*, INST. FOR JUST. (May 6, 2024) ...................................15

Michael Silberman, *Streetlights as Spyware*, TECH POL'Y PRESS (Aug. 30, 2023) ...................................................................................................................16

*NJ Town Resorts to Talking Drones to Enforce Social Distancing*, WNBC (Apr. 9, 2020, 11:08 AM) ...................................................................................15

Patrick Sisson, *Welcome to Chula Vista, where police drones respond to 911 calls*, MIT TECH. REV. (Feb. 27, 2023).........................................................17

Sam Jaffe Goldstein, *'Nothing Kept Me Up at Night the Way the Gorgon Stare Did.'*, LONGREADS (June 21, 2019) ............................................................16

*Street Level Surveillance: Automatic License Plate Readers*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023) ................................................... 3, 4, 11

*Street Level Surveillance: Surveillance Camera Networks*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023) ...................................................................16

Thomas K. Clancy, *The Framers' Intent: John Adams, His Era, and the Fourth Amendment*, 86 IND. L.J. 979 (2011) ..........................................................7

Tina Moore, *NYPD used drones for arrests in pro-Palestine protests in NYC*, N.Y. POST (Oct. 28, 2023, 11:45 AM) ........................................................15

WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (reprint 6th ed. 1989) ................................................................................................8

**Constitutional Provisions**

U.S. CONST. amend. IV ..........................................................................................6

**INTEREST OF *AMICUS CURIAE*[1]**

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Project on Criminal Justice was founded in 1999 and focuses on the scope of substantive criminal liability, the proper and effective role of police in their communities, the protection of constitutional and statutory safeguards for criminal suspects and defendants, citizen participation in the criminal justice system, and accountability for law enforcement officers.

Cato's interest in this case arises from its mission to support the rights that the Constitution guarantees to all citizens. *Amicus* has a particular interest in this case as it concerns the continuing vitality of the Fourth Amendment and meaningful restraints on the exercise of government power.

---

[1] Fed. R. App. P. 29 Statement: No counsel for either party authored this brief in any part. No person or entity other than *amicus* made a monetary contribution to its preparation or submission. All parties have consented to the filing of this brief.

## STATEMENT OF THE ISSUES

1.      Whether Appellants have sufficiently stated a claim under the Fourth Amendment by asserting that the City of Marco Island's warrantless and suspicionless collection and maintenance of ALPR records for at least three years violates Appellants' legitimate expectation of privacy in "the whole of their physical movements," as recognized in *Carpenter v. United States*, 585 U.S. 296, 310 (2018), because the aggregation of such information can retroactively reveal detailed accounts of their movements over time?

2.      Whether the district court erred in narrowing *Carpenter* to a bright-line rule against the warrantless access of cell-site location information or its technological equivalent instead of assessing the particular circumstances of this case and whether the City's use of ALPRs represents a permeating police surveillance which the Fourth Amendment was designed to impede?

3.      Whether the district court erred in not allowing Appellants to proceed to discovery to resolve fact-intensive issues, including how much data is collected by the City's ALPRs, how long it is kept, and who it is available to, which cannot appropriately be decided in connection with a motion to dismiss?

2

**INTRODUCTION AND SUMMARY OF ARGUMENT**

On April 23, 2021, the City of Marco Island installed automatic license plate readers (ALPRs) at each of the three bridges connecting Marco Island to mainland Florida. Pl's First Am. Compl. 2. ALPRs "are high-speed, computer-controlled camera systems" that "capture all license plate numbers that come into view, along with the location, date, and time," in addition to "images of the vehicle, the vehicle's drivers and passengers [and] its immediate surroundings." *Street Level Surveillance: Automatic License Plate Readers*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023) [hereinafter *ALPRs*].[2] This data is then stored in a central database, letting officers track both real-time and "historical travel patterns of any vehicle." Dave Maass, *Data Driven 2: California Dragnet—New Data Set Shows Scale of Vehicle Surveillance in the Golden State*, ELEC. FRONTIER FOUND. (Apr. 22, 2021).[3]

ALPR systems are extremely sophisticated. They "can reveal the direction and speed a person traveled through triangulation" and, with enough time, "a vehicle's historical travel." *ALPRs*, *supra*. ALPR systems perform searches against "previous ALPR-captured images," ranging from "the text of license plate data with its location and metadata to images of both the plate and the vehicle with a full AI analysis." *Automated License Plate Readers Market Survey Report*, NAT'L URB.

---

[2] Available at https://tinyurl.com/3s9b79dj.

[3] Available at https://tinyurl.com/35b56y9s.

SEC. TECH. LAB'Y 8–9 (June 2025) [hereinafter *ALPR Report*].[4] Algorithms track "travel patterns and predict where a driver may be in the future," and can be used to identify visitors to a specific location. *ALPRs*, *supra*. Using "a few keystrokes," officers can generate a comprehensive map of a person's movements throughout a city over a set period, "with few safeguards and little oversight." Maass, *supra*.

The ALPRs the City installed on Marco Island's bridges automatically record and archive every vehicle entering or leaving the island, and the City retains that information for at least three years. Pl's First Am. Compl. 2. The Appellants are residents of Marco Island who cross the bridges nearly every day. *Id.* at 4. They sued, alleging that the City's warrantless recording of residents' entry to and exit from the island—and its maintaining that information for future review and inspection—violate the Fourth Amendment. *Id.* at 3. Yet the district court dismissed their complaint, finding that the Appellants lacked a cognizable privacy interest in the data collected by the City because ALPRs "merely record data concerning vehicles, not cell phones," and "a car does not track nearly exactly the movements of its owner." Order 5–6.

Although the City's program is currently limited to three cameras, nothing in the decision below would prevent its expansion of the ALPR network to most of the island. Left undisturbed, this precedent would authorize the City to construct a

---

[4] Available at https://tinyurl.com/4cbbcmfe.

comprehensive surveillance system capable of recording every resident's movements without judicial oversight.

But Fourth Amendment protections do not evaporate once someone goes upon the public roadways. While the Supreme Court once held that a person has no expectation of privacy in "movements from one place to another," *United States v. Knotts*, 460 U.S. 276, 281 (1983), it has since qualified its analysis. As technology has advanced, the Court has recognized that the government's collection and inspection of individuals' location history can amount to "too permeating police surveillance" and violate the Fourth Amendment. *Carpenter v. United States*, 585 U.S. 296, 305 (2018) (citation omitted).

The Fourth Amendment was designed to eliminate indiscriminate searches, with the sting of the "general warrants" that allowed British officials to scour through homes and papers without cause still fresh in American minds. Today's technology similarly allows government officials to review intimate details of a person's life—including financial information[5] and location information—with no probable cause, at just the click of a button. Without judicial oversight, tools like ALPR databases give police the "unbridled discretion to rummage" for evidence that the Framers sought to prohibit. *See Riley v. California*, 573 U.S. 373, 399, 403 (2014).

---

[5] *See*, *e.g.*, Jennifer Schulp, *The SEC Is Starting a Massive Database of Every Stock Trade*, REASON (Feb. 7, 2023), http://tinyurl.com/56vhex57.

The district court's acceptance of all government tracking except the very most exhaustive kind would invite the warrantless deployment of many technologies to surveil the public. Modern surveillance tools such as ALPRs, military-grade drones, enhanced security cameras, and other cutting-edge sensors let the government monitor millions of people with ease. Law enforcement can track movements, detect faces, record conversations—and store such information indefinitely.

This Court should reverse the decision below and check the encroaching electronic eyes and ears that could capture, and forever store, islanders' every move.

## ARGUMENT

### I. ALPRS REPLICATE THE GENERAL WARRANTS THE FOURTH AMENDMENT WAS DESIGNED TO FORBID.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Its protections were "the founding generation's response to the reviled 'general warrants.'" *Riley*, 573 U.S. at 403. Those warrants "specified only an offense . . . and left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched." *Steagald v. United States*, 451 U.S. 204, 220 (1981). These abusive devices were "[v]ivid in the memory" of the Framers when the Fourth Amendment was drafted. *Stanford v. Texas*, 379 U.S. 479, 481 (1965).

6

The Constitution supplies "objective criteria to measure the propriety of government actions"[6] as well as a "judicial check on the determination of the executing officials." *Steagald*, 451 U.S. at 220. Its text is "precise and clear," reflecting its Framers' determination that Americans should be secure "from intrusion and seizure by officers acting under unbridled authority of a general warrant." *Stanford*, 379 U.S. at 481.

The Founders drew no dividing line between searches of public and private places. For instance, the First Congress required federal customs officials to obtain warrants to search not only homes for contraband, but also commercial buildings, stores, and any "other place." Funding Act of 1790, Act of August 4, 1790, ch. 35, § 48, 1 Stat. 145 (codifying a warrant requirement before searching any "dwelling-house, store, building or other place"); *see also Buonocore v. Harris*, 65 F.3d 347, 355 (4th Cir. 1995) (noting that the First Congress was the same legislature that adopted the Fourth Amendment). The Supreme Court has emphasized that the "basic guideposts" in measuring the Fourth Amendment's protective embrace include securing "the privacies of life against arbitrary power" and placing "obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305 (internal citations and quotation marks omitted).

---

[6] Thomas K. Clancy, *The Framers' Intent: John Adams, His Era, and the Fourth Amendment*, 86 IND. L.J. 979, 980 (2011).

Analogies to the pre-digital, "manual" era of government surveillance do not always resolve the reasonableness of inspections of digital records. *See id.* at 312; *Riley*, 573 U.S. at 400, 403. Nevertheless, Marco Island's ALPRs are the modern-day equivalent of a forbidden general warrant, and the district court erred in holding otherwise. It rejected the Appellants' Fourth Amendment arguments because (1) the City's ALPRs do not track individuals beyond public roads and (2) its current program "tell[s] very little about a person's movements." *See* Order 4–6. Both rationales are mistaken. First, the Supreme Court has held that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere." *Carpenter*, 585 U.S. at 310.

Second, the district court misapplied Supreme Court precedent by suggesting that only exhaustive surveillance qualifies as a search. *See* Order 6 (finding no search because "the ALPRs do not track the whole of [Appellants'] physical movements"). Even a single intentional act to reveal otherwise hidden information can qualify as a search. *See Arizona v. Hicks*, 480 U.S. 321, 324–25 (1987) (moving a stereo to read its serial number constituted a search, even though the stereo itself was in plain view). Now, as at the Founding, "to search" means simply "to look over or through for the purpose of finding something; to explore; to examine by inspection." *Kyllo v. United States*, 533 U.S. 27, 32 n.1 (2001) (quoting WEBSTER, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE 66 (1828) (reprint 6th ed. 1989)). Here,

law enforcement has "looked through" the City's vast ALPR database, so it has conducted a search.

The district court's attempt to distinguish *Carpenter* only underscores its error. *See* Order 5 (claiming that ALPRs "hardly compare" to the CSLI data in *Carpenter*). In *Carpenter*, the Supreme Court held that law enforcement conducted a search when it acquired from a commercial third party 13,000 datapoints about one individual's movements over a period of 127 days. 585 U.S. at 296, 302, 320. Here, the City itself installed purpose-built surveillance devices that continuously record the movements of thousands of residents for inspection at any point in the following three years. The City's program is even more sweeping than the cell-site data inspection held to be a search in *Carpenter*.

Similarly, in *Riley*, the Supreme Court rejected warrantless inspections of cell phones seized from arrestees—who have lesser privacy interests than do the Marco Islander Appellants. *See Riley*, 573 U.S. at 378; *Carpenter*, 585 U.S. at 301–02. Without warrants or even reasonable suspicion, the City's officers collect and inspect revealing information about residents' locations over three-year stretches. And nothing in the decision below would prevent a substantial expansion of this surveillance over most of the island.

As a sister circuit has held, the Fourth Amendment is meant to safeguard against such a possibility. In *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024),

the Fifth Circuit held that "geofence warrants" for Google location-history records were akin to general warrants and "plainly unconstitutional." *Id.* at 836, 838. The court expressed particular concern that a geofence warrant lets law enforcement "retroactively track anyone with Location History enabled, regardless of whether a particular individual is suspicious." *Id.* at 834. Such warrants "allow law enforcement to rummage through troves of location data . . . without any description of the particular suspect or suspects to be found"—the very practice the Fourth Amendment was designed to prohibit. *Id.* at 837–38.

Like geofence warrants, ALPR programs allow police to track the movements of "everyone in sight"—without ever needing to produce evidence of suspected criminal activity. *Id.* at 836 (citation omitted). This unfettered surveillance power is "indistinguishable from what might be done under a general warrant," *Chimel v. California*, 395 U.S. 752, 767 (1969), and constitutes the precise sort of "general, exploratory rummaging" the Fourth Amendment prohibits. *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971).

II.  **THE DISTRICT COURT'S DECISION INVITES THE GOVERNMENT TO BUILD NETWORKS OF CONTINUOUS SURVEILLANCE.**

Courts are "obligated . . . to ensure that the 'progress of science' does not erode Fourth Amendment protections," especially freedom "from unreasonable governmental intrusion." *Carpenter*, 585 U.S. at 320 (internal citations omitted);

*Kyllo*, 533 U.S. at 31 (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Law enforcement agencies are already testing and even using surveillance systems that enable comprehensive and continuous tracking of citizens—especially when combined. The district court's decision encourages this dangerous trend by eroding constitutional protections against public monitoring. *See Kyllo*, 533 U.S. at 34.

### A.  ALPRs

The ALPRs that are specifically at issue in this case have become an important surveillance tool for law enforcement. The rate at which ALPRs collect data is staggering—some devices can collect data on "thousands of plates per minute." *ALPRs*, *supra*. When a city deploys ALPRs, locals can do little to avoid them.[7] As a result, most of the data collected involves the movements of ordinary, law-abiding citizens. For example, in 2019, 82 California agencies "collected more than 1 billion license plate scans using ALPRs." Maass, *supra*. But "99.9% of this surveillance data was not actively related to an investigation when it was collected." *Id.*

Even more concerningly, the voluminous information stockpiled in ALPR databases is often shared "with hundreds of agencies around the country." *Id.* Even when there is no official data-sharing agreement between agencies, local law

---

[7] *Id.* (explaining that ALPRs are frequently installed on traffic lights, telephone poles, street lights, and at the entry and exit points of public roadways, while others are affixed to police patrol cars, "allowing law enforcement officers to capture data from license plates as they drive around the city").

enforcement is eager to provide federal agencies with ALPR data. For example, local police throughout the country are helping ICE track immigrants by "performing lookups in Flock's AI-powered [ALPR] system for 'immigration' related searches." Jason Koebler & Joseph Cox, *ICE Taps into Nationwide AI-Enabled Camera Network, Data Shows*, 404 MEDIA (May 27, 2025, 9:36 AM).[8] Although ICE does not have a contract with Flock, "the agency sources data from Flock's cameras by making requests to local law enforcement," with "more than 4,000 nation and statewide lookups by local and state police done either at the behest of the federal government or as an 'informal' favor to federal law enforcement." *Id.* These searches give ICE access to records "across a nation and statewide network of law enforcement agencies," including records from states like Illinois that "specifically ban[] the use of ALPR data for immigration enforcement." *Id.* And because "police almost never get a warrant to perform a Flock search," there is little to no oversight, allowing ICE "side-door access to a tool that [it] do[es] not formally have access to." *Id.*

### B. Drones

"Drones have made surveillance cheaper, easier, and more effective." Jessica Dwyer-Moss, *The Sky Police: Drones and the Fourth Amendment*, 81 ALB. L. REV. 1047, 1049 (2017–2018). Varying in size from "business jets [to] small enough to

---

[8] Available at https://tinyurl.com/mwz7r2b2.

fit into the palm of someone's hand," they can be "virtually undetectable." *Id.* at 1048. They can carry cameras, thermal imaging sensors, microphones, license plate readers, facial recognition software, cell-site simulators, and even weapons. Beryl Lipton, *Drones as First Responder Programs Are Swarming Across the United States*, ELEC. FRONTIER FOUND. (June 27, 2024).[9] Most troublingly, they can and do "observe individuals in previously private and constitutionally protected spaces, like their backyards, roofs, and even through home windows." *Id.*

More than 1,400 police departments now use drones, a number that is growing as cities continue to adopt "drone as first responder" programs. Jay Stanley, *Eye-in-the-Sky Policing Needs Strict Limits*, ACLU 1 (July 27, 2023).[10] These programs deploy drones in response to 911 calls and other service requests, and they can help officers assess a situation before arriving at the scene. Lipton, *supra*. However, these programs also enable around-the-clock warrantless—often, suspicionless—surveillance.

Consider what happened to Daniel Posada in Chula Vista, California—the city with the nation's first and longest-running drone-as-first-responder program. After

---

[9] Available at https://tinyurl.com/2wp67bz7. At least one company has starting developing Taser-equipped drones. Ese Olumhense, *Axon's Ethics Board Resigned Over Taser-Armed Drones. Then the Company Bought a Military Drone Maker*, WIRED (Sept. 8, 2023, 1:46 PM), https://tinyurl.com/mkcwbauv.

[10] Available at https://tinyurl.com/yc37jpmd.

Daniel and his girlfriend had an argument at a bus stop, a bystander called 911 and a drone was deployed from a police station to investigate. Dhruv Mehrotra & Jesse Marx, *The Age of the Drone Police is Here*, WIRED (June 5, 2024, 6:00 AM).[11] On its way to Daniel, the drone "cross[ed] the airspace of 23 blocks, potentially exposing thousands of Chula Vista residents to the gaze of law enforcement." *Id.* The drone spied Daniel as he was riding his bike down the street, and "[w]ithin seconds, a police car pulled up alongside him, and an officer was soon rummaging through his pockets"—even though no crime had occurred. *Id.*

Since Daniel's city began its drone-as-first-responder program in 2018, drones have "criss-cross[ed] the skies . . . nearly 20,000 times." *Id.* They have amassed hundreds of hours of video footage of the city's residents, routinely flying "over backyards and above public pools, high schools, hospitals, churches, mosques, immigration law firms, and even the city's Planned Parenthood facility." *Id.* While Chula Vista maintains that it does not use drones for routine surveillance, records from the city show that it is not uncommon for drones to be deployed in response to minor complaints such as "reports of 'loud music', a 'water leak,' and someone 'bouncing a ball against a garage.'" Stanley, *Eye-in-the-Sky Policing*, *supra*, at 2.

Further, not all cities have limited their use of drones to emergency response.

---

[11] Available at https://tinyurl.com/d9jve3db.

14

They have been used to surveil public events[12] and protests,[13] search for zoning and code violations,[14] enforce pandemic-era social distancing,[15] and even monitor Labor Day weekend backyard parties.[16]

The district court's decision would permit these types of drone surveillance and open the door to even more terrifying technologies. Drones like the military's Gorgon Stare—which provide city-wide and high-definition imagery from 25,000 feet in the air—could be deployed to stalk Marco Islanders. Sam Jaffe Goldstein, *'Nothing Kept Me Up at Night the Way the Gorgon Stare Did.'*, LONGREADS (June

---

[12] Cybele Mayes-Osterman & Josh Meyer, *Military parade is coming to DC soon. Officials gave a preview of what to expect*, USA TODAY (June 10, 2025, 8:13 AM), https://tinyurl.com/3e4xu6vu (using drones to surveil crowds at a parade).

[13] Tina Moore, *NYPD used drones for arrests in pro-Palestine protests in NYC*, N.Y. POST (Oct. 28, 2023, 11:45 AM), https://tinyurl.com/4j459k5n; A.J. Vicens & Raphael Satter, *As 'No Kings' protests denounce Trump, surveillance worries emerge*, REUTERS (Oct. 19, 2025, 12:51 PM), https://tinyurl.com/2yy97r9t (discussing concerns about the government using drones to surveil protesters).

[14] Hannah Fry, *Government drones used in 'runaway spying operation' to peek into backyards in Sonoma County, lawsuit says*, L.A. TIMES (June 6, 2025, 6:06 PM), https://tinyurl.com/2bjfuwz4 (discussing alleged use of drones to search for code violations); Matt Powers, *Michigan Supreme Court Creates Giant Loophole for Warrantless Surveillance*, INST. FOR JUST. (May 6, 2024), https://tinyurl.com/42knayye (same).

[15] *NJ Town Resorts to Talking Drones to Enforce Social Distancing*, WNBC (Apr. 9, 2020, 11:08 AM), https://tinyurl.com/mr3rmsk7; Chaim Gartenberg, *Social-distancing detecting 'pandemic drones' dumped over privacy concerns*, THE VERGE (Apr. 23, 2020, 10:51 AM), https://tinyurl.com/yaev57d9.

[16] Jake Offenhartz, *New York police will use drones to monitor backyard parties this weekend, spurring privacy concerns*, ASSOC. PRESS (Aug. 31, 2023, 7:53 PM), https://tinyurl.com/bdf9k25z.

21, 2019).[17] As long as surveillance observes only public areas, the City could limitlessly track residents using aerial systems.

### C. Security Cameras

Today's security cameras bear little resemblance to those of decades past. Many are "capable of 360-degree video, infrared vision, or the ability to pan, tilt, and zoom," and they "can be equipped with real-time face recognition or license plate recognition software." *Street Level Surveillance: Surveillance Camera Networks*, ELEC. FRONTIER FOUND. (updated Oct. 1, 2023).[18] They can be linked with automated license plate readers, smart streetlights,[19] gunshot detection systems,[20] cell-site simulators,[21] and drones, all of which "dramatically expand surveillance

---

[17] Available at https://tinyurl.com/utfe65f2.

[18] Available at https://tinyurl.com/3za9mtbu.

[19] Michael Silberman, *Streetlights as Spyware*, TECH POL'Y PRESS (Aug. 30, 2023), https://tinyurl.com/4a8twrrn (discussing privacy concerns surrounding use of smart streetlights, which allow police to "quietly layer invisible surveillance technologies . . . once [the streetlights are] in place").

[20] Helen Webley-Brown, et al., *ShotSpotter and the Misfires of Gunshot Detection Technology*, SURVEILLANCE TECH. OVERSIGHT PROJECT (July 14, 2022), https://tinyurl.com/bdd42rds. *See also* Dhruv Mehrotra & Joey Scott, *Here Are the Secret Locations of ShotSpotter Gunfire Sensors*, WIRED (Feb. 22, 2024, 8:18 PM), https://tinyurl.com/msdbuk7s.

[21] *Cell Site Simulators*, NAT'L ASSOC. OF CRIM. DEF. LAWS. (Apr. 28, 2016), https://tinyurl.com/4vx26fdz ("Cell Site Simulators, also known as IMSI catchers or Stingrays, mimic cell towers and trick phones within their radius into communicating with them instead, during which they are able to collect information about the device.").

16

capabilities." Patrick Sisson, *Welcome to Chula Vista, where police drones respond to 911 calls*, MIT TECH. REV. (Feb. 27, 2023);[22] *see also* Lipton, *supra*.

Nowhere is surveillance technology more prevalent than in New York City. The NYPD relies on an extensive system of video surveillance to "track and profile millions of New Yorkers each day." Akela Lacy, *An NYPD Camera Points Directly into Their Bedroom. They're Suing the City Over it.*, THE INTERCEPT (Oct. 28, 2025, 5:00 AM).[23] These tens of thousands of cameras all feed into one centralized network: the Domain Awareness System. *Id.* This system "collects the identity, location, banking details, vehicle information, social media activity, and friend groups of all who live in or enter the city. It combines these entries with civil and criminal records and converts them into digital profiles, reconstructing, in effect, the private lives of millions." *Id.*

Such comprehensive and inescapable monitoring could blanket every square inch of public space on Marco Island under the district court's rule. Residents would subsist under the watch of Panopticon. *Cf.* GEORGE ORWELL, 1984 at 3 (1949) ("There was of course no way of knowing whether you were being watched at any given moment. How often, or on what system, the Thought Police plugged in on any individual wire was guesswork."). The district court should be reversed for failing

---

[22] Available at https://tinyurl.com/454ndn84.

[23] Available at https://tinyurl.com/4wzzx7zn.

17

"to place obstacles in the way of a too permeating police surveillance." *Carpenter*, 585 U.S. at 305 (internal quotations omitted).

## CONCLUSION

For these reasons and those given by the Plaintiffs-Appellants, this Court should reverse the district court's order and remand for further proceedings.

Respectfully submitted,

/s/Matthew P. Cavedon

Matthew P. Cavedon
   *Counsel of Record*
Brent Skorup
Laura A. Bondank
CATO INSTITUTE
1000 Massachusetts Ave., N.W.
Washington, DC 20001
(706) 309-2859
mcavedon@cato.org

Dated: December 23, 2025

*Counsel for Amicus Curiae*

18

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 3,894 words, excluding the parts exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface in 14-point Times New Roman typeface.

<u>/s/Matthew P. Cavedon</u>

Dated:  December 23, 2025          *Counsel for Amicus Curiae*

19

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on December 23, 2025, he electronically filed the foregoing *amicus curiae* brief with the Clerk of the Court for the Eleventh Circuit using the CM/ECF system. The undersigned also certifies that all participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/Matthew P. Cavedon

Dated: December 23, 2025                *Counsel for Amicus Curiae*

20