WEISS SEROTA
HELFMAN COLE + BIERMAN

AMANDA A. PULIDO
apulido@wsh-law.com

March 20, 2026

Clerk of the Court
United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, GA 30303

**Re:** ***Shannon Schemel, et al. v. City of Marco Island, Florida*** **– Case No. 25-13913-E, Citation of Supplemental Authority**

Dear Sir or Madam:

Pursuant to Federal Rule of Appellate Procedure 28(j) and 11th Circuit Rule 28, I.O.P. 6, Appellee, City of Marco Island, Florida, hereby notifies the Court of its intention to rely upon *United States v. Porter*, No. 25-60163, 2026 WL 746292 (5th Cir. Mar. 17, 2026) as supplemental authority. Appellee relies upon *Porter* in support of its argument that the Appellee's automated license plate recognition ("ALPR") systems do not constitute a search as they solely capture publicly available information—license plate numbers. *See* A.B.: 10–15.

In *Porter*, the Fifth Circuit considered whether an ALPR system of ten cameras constituted a search. Similar to Appellants' arguments before this Court, the defendant claimed that he had a reasonable expectation of privacy in his movements that were captured by ALPR cameras and that a warrant was therefore required for police to obtain data from the ALPR system. 2026 WL 746292, at *2. The Fifth Circuit disagreed and found that because the system reveals nothing more than a license plate number, the ALPR system is more comparable to the beeper signals in *United States v. Knotts*, 460 U.S. 276 (1983), than to the CSLI data at issue in *Carpenter v. United States*, 585 U.S. 296 (2018). *Id.* at *4. The court emphasized that while the ALPR system might allow the government to access a historical record for some time, the ALPR technology ultimately "provides only periodic information about a vehicle's location when a vehicle passes one of its ten locations where an [A]LPR camera is stationed . . . and is much more limited than CSLI and geofence data, which is capable of capturing a greater volume of comprehensive information with a higher degree of quality and precision." *Id.* (footnotes omitted).

*Porter* supports Appellee's contention that this case is incomparable to *Carpenter* and its progeny. Further, as the Fifth Circuit concluded, because the ALPR system captures nothing more than Appellants' license plate information, no search in violation of the Fourth Amendment has occurred.

Respectfully,

*/s/ Amanda A. Pulido*

**MATTHEW M. MANDEL**
Florida Bar No. 147303
**ANNE R. FLANIGAN**
Florida Bar No. 113889
**AMANDA A. PULIDO**
Florida Bar No. 1039122
**WEISS SEROTA HELFMAN**
**COLE & BIERMAN, P.L.**
200 East Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
Telephone: (954) 763-4242
mmandel@wsh-law.com
aflanigan@wsh-law.com
apulido@wsh-law.com

*Counsel for Appellee,*
*The City of Marco Island*

Encl.
cc: All Counsel of Record (with enclosure)

2026 WL 746292
Only the Westlaw citation is currently available.
United States Court of Appeals, Fifth Circuit.

UNITED STATES of America, Plaintiff—Appellee,
v.
Elijah PORTER, Defendant—Appellant.

No. 25-60163
|
FILED March 17, 2026

**Synopsis**

**Background:** Following denial of his motions to suppress and to dismiss indictment, defendant was convicted in the United States District Court for the Southern District of Mississippi, Taylor B. McNeel, J., of possession of a machinegun, and he appealed.

**Holdings:** The Court of Appeals, Smith, Circuit Judge, held that:

[1] officer's use of location data obtained from license plate reader (LPR) system to identify vehicle associated with criminal activity did not violate Fourth Amendment;

[2] officer had reasonable suspicion to stop defendant's vehicle; and

[3] district court did not commit plain error when it determined that gun was in plain view.

Affirmed.

**Procedural Posture(s):** Appellate Review; Pre-Trial Hearing Motion.

West Headnotes (15)

**[1] Criminal Law**

When reviewing denial of suppression motion, Court of Appeals reviews factual findings for clear error and legal conclusions—including whether expectation of privacy is reasonable under circumstances—de novo.

**[2] Criminal Law**

When reviewing denial of suppression motion, Court of Appeals views evidence in light most favorable to government, as prevailing party below, and will uphold district court's ruling if there is any reasonable view of evidence to support it.

**[3] Criminal Law**

When denial of motion to suppress is based on live testimony, clearly erroneous standard is particularly strong because judge had opportunity to observe demeanor of witnesses.

**[4] Criminal Law**

When ruling on motion to suppress where testimony conflicts with video evidence, court must view facts in light depicted by videotape, but when video evidence is ambiguous, no such consideration applies.

**[5] Search, Seizure, and Arrest**

Police officer's use of location data obtained from license plate reader (LPR) system to identify vehicle associated with criminal activity did not invade driver's reasonable expectation of privacy, and thus did not constitute "search" for which warrant was required, even though LPR system allowed government to access historical record for some time; LPR technology in city provided only periodic information about vehicle's location when vehicle passed one of its ten locations where LPR camera was stationed. U.S. Const. Amend. 4.

More cases on this issue

**[6] Search, Seizure, and Arrest**

Where individual has reasonable expectation of privacy, official intrusion into that private sphere generally qualifies as search and requires

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works.

warrant supported by probable cause. U.S. Const. Amend. 4.

**[7] Search, Seizure, and Arrest**

Person does not surrender all Fourth Amendment protection by venturing into public sphere, but person traveling in automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another. U.S. Const. Amend. 4.

**[8] Search, Seizure, and Arrest**

Police officer had reasonable suspicion to stop suspect's vehicle based solely on automatic license plate reader (LPR) hit that revealed outstanding arrest warrant for vehicle's owner, even though LPR did not include physical description of driver. U.S. Const. Amend. 4.

More cases on this issue

**[9] Search, Seizure, and Arrest**

If police have reasonable suspicion, grounded in specific and articulable facts, that person they encounter was involved in or is wanted in connection with completed felony, then *Terry* stop may be made to investigate that suspicion. U.S. Const. Amend. 4.

**[10] Costs, Fees, and Sanctions**

District court did not commit plain error when it determined that gun was in plain view in defendant's vehicle, thus permitting its warrantless seizure pursuant to plain view doctrine, even though gun was not visible in officer's body camera footage, and officer initially left gun in unlocked car in residential neighborhood and did not immediately tell his colleague at scene about it; officer's body camera may not have fully captured everything that he saw at eye-level with dynamic field of vision because camera was in static position near his torso, and officer credibly testified that he did not raise immediate alarm bells because he wanted "to see if [defendant] was going to be honest." U.S. Const. Amend. 4.

More cases on this issue

**[11] Criminal Law**

Court of Appeals reviews preserved challenge to statute's constitutionality de novo.

**[12] Constitutional Law**

To sustain facial challenge to statute's constitutionality, challenger must establish that no set of circumstances exists under which statute would be valid.

**[13] Constitutional Law**

Facial challenge to statute's constitutionality will necessarily fail if statute is constitutional as applied to defendant's individual case.

**[14] Weapons**

Machineguns do not receive Second Amendment protection. U.S. Const. Amend. 2.

**[15] Courts**

Under rule of orderliness, only intervening change in law permits subsequent panel to decline to follow prior circuit precedent.

Appeal from the United States District Court for the Southern District of Mississippi, USDC No. 1:24-CR-11-1, Taylor B. McNeel, U.S. District Judge

**Attorneys and Law Firms**

Gaines H. Cleveland, Assistant U.S. Attorney, U.S. Attorney's Office, Hunter L. McCreight (argued), U.S. Attorney's Office, Gulfport, MS, for Plaintiff-Appellee.

Omodare Jupiter, Esq., Assistant Federal Public Defender, Federal Public Defender's Office, Jackson, MS, Victoria

Elizabeth McIntyre (argued), Federal Public Defender's Office, Gulfport, MS, for Defendant-Appellant.

Before Smith, Wiener, and Higginson, Circuit Judges.

**Opinion**

Jerry E. Smith, Circuit Judge:

***1** Elijah Porter was charged with possession of a machinegun in violation of 18 U.S.C. § 922(o). He challenges (1) the denial of his motion to suppress vehicle-location data obtained from a license plate reader ("LPR") and a firearm obtained in a vehicle search and (2) the district court's ruling that 18 U.S.C. § 922(o) is not unconstitutional. Because the use of an LPR did not constitute a search, no warrant was required; the stop was supported by reasonable suspicion, and the officer found the Glock and its machinegun conversion switch in plain view. Our circuit precedent forecloses Porter's Second Amendment challenge. We affirm.

## I. Factual Background

### A. Evidentiary Hearing

At the suppression hearing, the district court heard testimony from Charles Hoggard, a former officer for the Gautier Police Department. Video footage from Hoggard's body camera was also presented.

#### 1. Officer Hoggard's Testimony

While on patrol in January 2024, Hoggard received an alert on his phone that an LPR located at a specific intersection captured the license plate of a vehicle that was associated with criminal activity. He contacted dispatch and was told that the vehicle was "associated with" Elijah Porter, who had a warrant for aggravated assault. Hoggard conducted a computer check for the license plate, which revealed the vehicle was associated with "James Stewart" or "E.L. Porter." He located the vehicle and conducted a traffic stop.

After identifying Porter as the driver, Hoggard detained him and patted him down. Hoggard observed a firearm protruding from under the driver's seat. He was able to see the slide and barrel of the firearm, and a "little silver switch on the back of it," which he "believed to be the switch of an automatic [G]lock." Hoggard asked Porter if there were any weapons in the car "to see if he was going to be honest" and later retrieved the firearm during an inventory search of the vehicle, at which point he had not yet confirmed that "the warrant was valid and true." After Hoggard secured the firearm in his patrol car, the warrant was confirmed, and he took Porter to the police station.

Hoggard stated that the LPR system allowed him to see when a vehicle had passed an LPR camera at a particular location, and he estimated there were no more than ten LPR cameras stationed across Gautier. He did not know how long the location data was stored within the LPR system, but he "could look and see how many times [a vehicle] passed within the general ... time period." Hoggard stated there had been other LPR "hits" on Porter's vehicle earlier that day and the day before, but he was not able to locate the vehicle on those occasions because of heavy traffic. He acknowledged that he did not have a physical description of Porter when he initiated the traffic stop. Hoggard also noted that after seeing the firearm, he left it in Porter's unlocked car, which was in a residential area, and did not immediately tell his colleague at the scene about the weapon.

#### 2. Body Camera Footage

***2** The footage is consistent with Hoggard's testimony. Hoggard patted Porter down next to the open driver's side door and asked if he had any weapons, to which Porter said he did not. Hoggard then removed several personal items from Porter's pockets and placed them on the driver's seat. Just as Hoggard turned toward the driver's seat, he asked Porter if there were any weapons in the car—Porter answered no. As Hoggard put Porter into his patrol unit, Hoggard removed an earbud from Porter's ear and returned to Porter's car to place it on the driver's seat with his other belongings.

Hoggard then locked Porter's car and told his colleague that he had to confirm "the hit." He returned to Porter's vehicle, opened the center console, and looked underneath the driver's seat. Immediately thereafter, he tried to flag down his colleague. Hoggard then reached under the driver's seat, pulled out a firearm, and said, "Oh, s--t." The firearm was not visible on the video until this point. Hoggard motioned again for his colleague to come over and told him there's "a f--king switch on that [G]lock." Hoggard then said, "it was basically in plain view," and "the barrel [was] sticking out from under the seat, so I saw it in plain view."

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

3. Porter's Arguments

Porter asserts that the use of LPR cameras to detect his vehicle's location constituted a search under the Fourth Amendment and that the vehicle-location data should be suppressed. He posits that he had a reasonable expectation of privacy in his location and movements that were captured by the LPR cameras and that a warrant was required for police to obtain such data from the LPR system. Porter also urges that the traffic stop was invalid because it was not supported by reasonable suspicion and that the firearm should be suppressed. Porter theorizes that even if the stop were lawful, the firearm was not in plain view and was not discovered during a lawful inventory search. And Porter claims that § 922(o) violates the Second Amendment, both facially and as applied to him. [1]

B. District Court's Rulings

In a bench ruling, the district court determined that § 922(o) is not unconstitutional and denied Porter's motion to dismiss the indictment. The court denied his motion to suppress the vehicle-location data, reasoning that "an individual traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in their movements from one place to another" and "motorists do not have a privacy interest in their license plates," since they are "constantly open to plain view of" passersby.

The court requested supplemental briefing on the threshold issue of whether the traffic stop was lawful. The court then stated that if the stop was valid, it would deny the motion to suppress based on its finding that the plainview doctrine applied. The court also determined that the inevitable-discovery doctrine would apply because the firearm would have been found during the inventory search.

After the parties submitted the requested supplemental briefing, the court concluded that the traffic stop was lawful, denied Porter's motion to suppress, and explained that the stop was valid for three reasons:

> First, Officer Hoggard, had reasonable suspicion to initiate the traffic stop based solely on the automatic license plate reader, or the ALPR, hit that revealed an outstanding arrest warrant for Mr. Porter; Number 2, the ["be on the lookout"] BOLO [report], or ALPR, hit does not need to include a physical description of the driver to provide an officer reasonable suspicion to initiate a traffic stop; and number 3, under the collective knowledge doctrine, the ALPR was reliable and provided Officer Hoggard with reasonable suspicion to initiate the traffic stop.

***3** Thereafter, Porter consented to a bench trial, [2] where he was found guilty.

II. Denial of Motion to Suppress

**[1]** **[2]** When reviewing the denial of a suppression motion, we review factual findings for clear error and legal conclusions—"including whether an expectation of privacy is reasonable under the circumstances"—*de novo*. *United States v. Gomez*, 276 F.3d 694, 697 (5th Cir. 2001) (internal quotation marks and citation omitted). The evidence is "viewed in the light most favorable to the Government, as the prevailing party below." *United States v. Garcia*, 99 F.4th 253, 266 (5th Cir. 2024). We "uphold the district court's ruling if there is any reasonable view of the evidence to support it." *United States v. Alvarez*, 40 F.4th 339, 344 (5th Cir. 2022) (internal quotation marks and citation omitted).

**[3]** **[4]** And "[w]hen the denial of a motion to suppress is based on live testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *United States v. Jefferson*, 89 F.4th 494, 502 (5th Cir. 2023) (internal quotation marks and citation omitted). "Where testimony conflicts with video evidence, our court must view the 'facts in the light depicted by the videotape,' " [3] but "[w]hen video evidence is 'ambiguous,' " no such consideration applies. [4]

III.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

### A. Vehicle Location Data

**[5]** Contrary to Porter's assertion, the use of an LPR system did not invade any reasonable expectation of privacy and did not constitute a search, so no warrant was required.

**[6]** **[7]** Where an individual has a reasonable expectation of privacy, "official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *United States v. Smith*, 110 F.4th 817, 830 (5th Cir. 2024) (internal quotation marks and citation omitted), *cert. denied*, ––– U.S. ––––, 146 S. Ct. 356, 223 L.Ed.2d 191 (2025). "A person does not surrender all Fourth Amendment protection by venturing into the public sphere," *Carpenter v. United States*, 585 U.S. 296, 310, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018), but "[a] person travel[ ]ing in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another," *United States v. Knotts*, 460 U.S. 276, 281, 103 S.Ct. 1081, 75 L.Ed.2d 55 (1983).

The LPR system provides periodic information about a vehicle's location on "public streets and highways." A scan occurs when a vehicle passes one of the locations where a camera is stationed. [5] The LPR system is not capable of tracking the "whole of [an individual's] physical movements," much less "for a very long period," to the extent that a cell phone can because the LPR system does not "faithfully follow[ ]" individuals "beyond public thoroughfares." [6] Indeed, Hoggard's previous inability to locate Porter's vehicle, notwithstanding the earlier "hits" and the LPR technology's around-the-clock capabilities, illustrates the significant limitations of this technology relative to cell-site location information ("CSLI"), which can "provide[ ] an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations." *Carpenter*, 585 U.S. at 311, 138 S.Ct. 2206 (internal quotation marks and citation omitted).

***4** With a gloss from *Olabisiomotosho v. City of Houston*, [7] which made clear that "[a] motorist has no privacy interest in their [*sic*] license plate number," the LPR system is more analogous to the beeper signals in *Knotts* [8] than to the CSLI at issue in *Carpenter.* True, the LPR system allows the government to access an historical record for some time, and that type of retrospective data can allow police to "travel back in time to retrace a person's whereabouts" without needing to "know in advance whether they want to follow a particular individual, or when." [9] But the LPR technology in the instant case provides only periodic information about a vehicle's location when a vehicle passes one of its ten locations where an LPR camera is stationed in Gautier and is much more limited than CSLI and geofence [10] data, which is capable of capturing a greater volume of comprehensive information with a higher degree of quality and precision. [11]

### B. Vehicle Search

#### 1. The Stop

**[8]** **[9]** The traffic stop was lawful because Hoggard had reasonable suspicion to stop Porter's vehicle. "The 'touchstone of Fourth Amendment analysis is reasonableness.' " *United States v. Henry*, 37 F.4th 173, 176 (5th Cir. 2022) (per curiam) (quoting *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc)). "[I]if police have reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." [12]

***5** There is no reason to disagree with the district court's thorough rationale:

> Officer Hoggard [ ] had reasonable suspicion to initiate the traffic stop based solely on the automatic license plate reader, or the ALPR, hit that revealed an outstanding arrest warrant for Mr. Porter; Number 2, the BOLO, or ALPR, hit does not need to include a physical description of the driver to provide an officer reasonable suspicion to initiate a traffic stop; and number 3, under the collective knowledge doctrine, the ALPR was reliable and provided Officer Hoggard with reasonable suspicion to initiate the traffic stop.

WESTLAW © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

After all, the BOLO report "provide[d] the reasonable suspicion necessary to justify an investigatory stop" because the arrest warrant information from the other Mississippi jurisdiction was "credibl[e] and reliabl[e]"—it "specifi[ed] Porter's vehicle information, allowed Hoggard to "verif[y]" the match, and related to an active warrant, which turned out to be valid. [13] Even though he didn't need to do so because "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy," Hoggard carefully conducted a computer check for the license plate, which revealed the vehicle was associated with "James Stewart" or "E.L. Porter." [14] That the vehicle may have belonged to someone other than Porter or that Hoggard lacked a physical description of the driver does not change the calculus in Porter's favor [15] because Hoggard had sufficiently specific information to stop the car—he knew the make and model, its license plate number, its approximate location, and that Porter was wanted for arrest for aggravated assault.

### 2. Glock Pistol and Machinegun Conversion Switch

#### a. Plain View

**[10]** Hoggard found the Glock pistol and machinegun conversion switch and testified in open court "that the barrel was sticking out from under the seat" in plain view. Not only was the "incriminating nature" of the automatic conversion switch "immediately apparent," [16] but the district judge, who had an opportunity to observe Hoggard's demeanor, said in no uncertain terms, "I do find Officer Hoggard's testimony to be credible." [17] There is no reason to depart from the district court's sound determination.

***6** One may be inappropriately tempted to engage in a frame-by-frame, instant replay-type analysis of Hoggard's behavior, based on the body camera footage, considering the proposition that "[w]here testimony conflicts with video evidence, our court must view the 'facts in the light depicted by the videotape.' " [18] But because the video evidence is ambiguous at best for Porter, no such consideration applies. [19]

Although we first notice the gun at about the six-minute mark when Hoggard physically removes it from under the driver's seat, his body camera may not have fully captured everything that he saw at eye-level with a dynamic field of vision because the camera was in a static position near his torso. [20] There is nothing that "plainly contradicts the district court's finding that the officer saw" the Glock and the switch "in plain view." [21]

Another rejoinder is that the factual circumstances suggest that Hoggard did not see the Glock and its switch in plain view. True, Hoggard initially left the Glock in an unlocked car in a residential neighborhood and did not immediately tell his colleague at the scene about the weapon. But there was no traffic on the side street, where another patrol car was already present and blocking incoming traffic from the cross street. And during the three-and-a-half-minute stretch between Hoggard's initial discovery of the Glock and the subsequent physical possession of it, Hoggard had other priorities— he escorted Porter to his patrol vehicle, put Porter's personal items in his car, and rolled its windows up to prevent rain from coming in. Hoggard did not raise the immediate alarm bells because he wanted "to see if [Porter] was going to be honest," something he testified to in open court, which the district court found credible.

The footage is not clear-cut in Porter's favor. In fact, it shows that Hoggard seamlessly reached under the seat in a "quick darting motion," suggesting that he knew precisely where the Glock and the switch were because he had previously seen them in plain view. Admittedly, the officer did exclaim, "Oh s--t," but that can be explained by the fact that physically seizing a suspect's gun that has an attached machinegun conversion device may not be an everyday occurrence even for experienced officers, who may be rightfully shocked. Far from being clear-cut in Porter's favor, the footage confirms that Hoggard contemporaneously corroborated that "[the Glock] was basically in plain view," and "the barrel [was] sticking out from under the seat, so [he] saw it in plain view."

***7** Viewing the evidence in the light most favorable to the government as the prevailing party, there is nothing that plainly contradicts the district court's reasoned assessment that Hoggard saw the Glock and its switch in plain view.

## IV. Constitutionality of a Criminal Statute

**[11]** **[12]** **[13]** This court reviews a preserved challenge to the constitutionality of a statute *de novo*. *United States v. Howard*, 766 F.3d 414, 419 (5th Cir. 2014). "When a litigant brings both facial and as-applied challenges, we generally

decide the as-applied challenge first because it is the narrower question." *Ostrewich v. Tatum*, 72 F.4th 94, 104 (5th Cir. 2023). "To sustain a facial challenge, 'the challenger must establish that no set of circumstances exists under which the statute would be valid.' "[22] A facial challenge will necessarily fail if a statute is constitutional as applied to a defendant's individual case. *Id.*

V. 18 U.S.C. § 922(o)

**[14]** **[15]** This court's jurisprudence forecloses Porter's Second Amendment challenge to 18 U.S.C. § 922(o) argument—machineguns "do not receive Second Amendment protection."[23] Indeed, very recently, we squarely answered this question, reasoning that *Hollis* continues to bind us" and that the defendant's "Second Amendment challenge to his § 922(o) conviction must fail" "because *Hollis* controls." *United States v. Wilson*, 164 F.4th 380, 385–87 (5th Cir. 2026). *Wilson* makes clear that "*Bruen* reinforces the portion of *Heller* on which *Hollis* relied."[24] Under our Rule of Orderliness,[25] "only an intervening change in the law ... permits a subsequent panel to decline to follow a prior Fifth Circuit precedent."[26] *Bruen* does not unequivocally overrule *Hollis* because *Bruen* addressed a law limiting the ability of law-abiding citizens to carry *handguns* outside the home. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 13–14, 142 S.Ct. 2111, 213 L.Ed.2d 387 (2022).

***8** AFFIRMED.

**All Citations**

--- F.4th ----, 2026 WL 746292

## Footnotes

1 Although he did at the district court, Porter does not make a Commerce Clause challenge on appeal.

2 Porter's jury-trial waiver, the one that he, his counsel, the prosecutor, and district judge signed, notes that Porter was "fully informed of [his] right to a trial by jury," "waive[d] that right," and "waive[d] [his] right to special findings." Some of the stipulations, that Porter "knowingly and voluntarily" agreed to, include that "Officer Hoggard ... received an alert for a 2017 White Ford Fusion ... associated with an outstanding arrest warrant for Elijah Porter" and "Elijah Porter was the driver, and sole occupant of the Ford Fusion."

3 *See United States v. Anderson*, No. 23-50110, 2024 WL 2829243, at *1 (5th Cir. 2024) (per curiam) (unpublished) (citing *Scott v. Harris*, 550 U.S. 372, 380-81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

4 *See id.* (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021)).

5 *See Knotts*, 460 U.S. at 281, 103 S.Ct. 1081 (reasoning that law enforcement's monitoring the beeper signals after placing a hidden beeper in a barrel of drug-precursor chemicals (which was later purchased by the suspect's accomplice and placed in the suspect's vehicle) "amounted principally to the following of an automobile on public streets and highways" and did not constitute a search).

6 *Cf. Carpenter*, 585 U.S. at 310–11, 138 S.Ct. 2206 ("A cell phone faithfully follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales.").

7 *See Olabisiomotosho*, 185 F.3d 521, 529 (5th Cir. 1999) (holding that the police did not need probable cause to use an onboard computer to check a stranded motorist's license plate number since "[a] motorist has no privacy interest in their license plate number").

8 *See Knotts*, 460 U.S. at 277–79, 285, 103 S.Ct. 1081 (noting that the beeper transmitted periodic radio signals that enhanced the police's ability to surveil the vehicle's movements and allowed police to track the vehicle to a drug lab); *see also id.* at 285, 103 S.Ct. 1081 (reasoning that a "scientific enhancement of this sort raises no constitutional issues which visual surveillance would not also raise").

9 *See Carpenter*, 585 U.S. at 312, 138 S.Ct. 2206; *see also Smith*, 110 F.4th at 834 (expressing "particular concern" with "the fact that a geofence will retroactively track anyone with Location History enabled, regardless of whether a particular individual is suspicious or moving within an area that is typically granted Fourth Amendment protection").

10 Though geofences are typically limited to a discrete time period, "a brief snapshot can expose highly sensitive information," such as a person's "visit to 'the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour-motel, the union meeting, the mosque, synagogue or church, [or] the gay bar,' or a location other than home during a COVID-19 shelter-in-place order." *See Smith*, 110 F.4th at 833 (citation omitted; alteration in original).

11 *Cf. Smith*, 110 F.4th at 823 ("Once a person enables Location History, Google begins to 'log[ ] [the] device's location [into the Sensorvault], on average, every two minutes' by 'track[ing] [the] user's location across every *app* and every *device* associated with the user's account.") (alteration and emphasis in original); *see also id.* (noting that the "data is 'considerably more precise than other kinds of location data, including cell-site location information because [Location History] is determined based on multiple inputs, including GPS signals, signals from nearby Wi-Fi networks, Bluetooth beacons, and cell towers' ") (alteration in original).

12 *United States v. Hensley*, 469 U.S. 221, 229, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985); *see United States v. Ochoa*, 667 F.3d 643, 649 (5th Cir. 2012) ("The officer making the arrest need not have direct knowledge of all the facts establishing probable cause, as long as he has communicated with the officer who does."); *see also United States v. Alvarez*, 40 F.4th 339, 352 (5th Cir. 2022) ("Officers may conduct an investigatory stop in reliance on information issued through police channels, such as a wanted flyer or bulletin or radio dispatch, if the information is based on 'articulable facts supporting a reasonable suspicion that the wanted person has committed an offense.' ") (citing *Hensley*, 469 U.S. at 232, 105 S.Ct. 675).

13 *United States v. Gonzalez*, 190 F.3d 668 (5th Cir. 1999) ("Whether a particular tip or BOLO report provides a sufficient basis for an investigatory stop may depend upon the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by others in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.") (citing *Alabama v. White*, 496 U.S. 325, 328-32, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

14 *See Kansas v. Glover*, 589 U.S. 376, 381, 140 S.Ct. 1183, 206 L.Ed.2d 412 (2020) (noting that "[t]he reasonable suspicion inquiry 'falls considerably short' of 51% accuracy").

15 *See Heien v. North Carolina*, 574 U.S. 54, 60, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014) ("To be reasonable is not to be perfect.").

16 *See United States v. Rodriguez*, 601 F.3d 402, 407 (5th Cir. 2010) (noting that the "plain view" exception "allows police to seize items where (1) the police lawfully entered the area where the item was located; (2) the item was in plain view; (3) the incriminating nature of the item was 'immediately apparent'; and (4) the police had a lawful right of access to the item") (citing *Horton v. California*, 496 U.S. 128, 136–37, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990)).

17 *See United States v. Gibbs*, 421 F.3d 352, 357 (5th Cir. 2005) ("One of the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses.") (internal quotation marks and citation omitted).

18 *Anderson*, 2024 WL 2829243, at *1 (citing *Scott v. Harris*, 550 U.S. 372, 380–81, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007)).

19 *See id.* ("When video evidence is 'ambiguous[,]' however, *Scott v. Harris* 'has no application.' ") (alteration in original) (citing *Aguirre v. City of San Antonio*, 995 F.3d 395, 410 (5th Cir. 2021)).

20 *See, e.g., United States v. Stuckey*, No.24-CR-2017-CJW-MAR, 2025 WL 34816, at *2 (N.D. Iowa 2025) (noting that "the body camera is positioned—on [the officer']s torso, and thus does not capture what [he] could see from an eye-level angle"); *United States v. Gray*, No.20-191 (CKK), 2021 WL 2209462, at *2 (D.D.C. 2021) ("Because the body-worn cameras focus only straight ahead and are lower than the officers' sight-line, the camera does not capture everything that each officer sees."); *United States v. Rowson*, 652 F. Supp. 3d 436, 444 (S.D.N.Y. 2023) ("[B]ody camera footage sometimes does not pick up nuances visible to the naked eye, including based on the different distances and angles involved, and that the camera may not have focused on the same, precise part of a suspect's anatomy as did the officers.").

21 *See United States v. Riggins*, No. 22-10306, 2023 WL 2964408, at *1 (5th Cir. 2023) (per curiam) (unpublished) ("Even if the body camera recording does not clearly show that the syringe was visible inside Riggins's pocket, we see nothing that plainly contradicts the district court's finding that the officer saw the syringe in plain view.").

22 *United States v. Diaz*, 116 F.4th 458, 471 (5th Cir. 2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)), *cert. denied*, ––– U.S. ––––, 145 S. Ct. 2822, 222 L.Ed.2d 1102 (2025).

23 *See Hollis v. Lynch*, 827 F.3d 436, 451 (5th Cir. 2016) (concluding that machineguns "do not receive Second Amendment protection" and noting that "[m]achineguns are dangerous and unusual and therefore not in common use").

24 *Wilson*, 164 F.4th at 386 ("In *Hollis*, the court cited dicta from [*District of Columbia v.*] *Heller*[, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008)] for the proposition that the Second Amendment does not protect dangerous and unusual weapons. And in *Bruen*, the Supreme Court reiterated that portion of *Heller*, observing that it is 'fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons that the Second Amendment protects the possession and use of weapons that are in common use at the time.' ").

25 *See Thompson v. Dall. City Att'y's Off.*, 913 F.3d 464, 468 n.17 (5th Cir. 2019) ("[A] panel's interpretation of a Supreme Court decision is binding on a subsequent panel even if the later panel disagrees with the earlier panel's interpretation.") (citing *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014) ("Even if persuaded that [our prior panel opinion] is inconsistent with [an earlier Supreme Court opinion], we may not ignore the decision, for in this circuit one panel may not overrule the decision of a prior panel.") (alteration in original)).

26 *United States v. Alcantar*, 733 F.3d 143, 145 (5th Cir. 2013); *id.* at 146 (noting that the intervening change in the law "must be unequivocal").

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.